NEW YORK LIFE INSURANCE COMPANY, a life insurance company of the State of New York, complainant-respondent,

*v.*

NATHAN WEISS and IDA K. WEISS, defendants-appellants.

[Argued February 9th, 1943. Decided May 18th, 1943.]

376

378

*Mr. Israel B. Greene,* for the defendants-appellants.

*Mr. Charles DeF. Besore,* for the complainant-respondent.

PER CURIAM.

The decree under review will be affirmed, for the reasons expressed in the opinion of Vice-Chancellor Kays.

HEHER, J.   (Dissenting.)

The decree, in my opinion, nullifies appellants' basic contractual rights. It canceled a "contract for reinstatement" of the policy upon the ground that it had been procured by a fraudulent misrepresentation of a material fact, in that the insured, in failing to disclose the attendance of a physician (Dr. Emery Krausz) in June, 1937, "did not truthfully

answer" one of the inquiries put to him by the insurer, and thus "was guilty of equitable fraud," if not conscious fraud.

At the time of the issuance of the policy, the insured was forty-seven years of age. There is no contention that there was fraud in its procurement. The policy lapsed for non-payment of the quarterly premium which matured on September 22d, 1937. On the ensuing November 10th, the insured made application for reinstatement of the policy on a form provided by the insurer; and it was reinstated two days thereafter upon payment of the arrears of premiums plus 5% interest. He testified that, having suffered pain for but a very brief period, he had forgotten the examination and treatment given by Dr. Krausz. He was not asked to submit to a medical examination.

On October 16th, 1939, the insured made claim for total and permanent disability benefits; and it was disallowed. The insurer thereupon instituted an inquiry; and shortly thereafter the bill of complaint herein was filed. The bill was subsequently amended. It avers that, within a period of two years prior to the making of the application for reinstatement of the policy, the insured "had consulted and had been treated" by physicians, "and had suffered from an illness or disease known as myodegeneration of the heart, coronary sclerosis and angina pectoris, and other grave ailments of the heart, and suffered from such illness or disease at the time" when the application for reinstatement was made, and "had falsely and fraudulently withheld such information from complainant in his application for reinstatement * * * and had falsely and fraudulently represented to complainant" that, at the time of making said application, he was "in the same condition of health as he was in when the said policy of life insurance was issued, and that he had not within the two years previous to the making of said application for reinstatement * * * had any illness or disease or consulted or been examined or treated by any physician;" that the insurer relied upon the truthfulness of the answers to the questions thus propounded in the application, and was thereby induced to reinstate the policy, but that, in point of fact, these answers were made "falsely" and "fraudulently;"

and that, for "said fraud * * * and the mistake on the part of the complainant induced" thereby, complainant had "elected to rescind" the "pretended contract" of reinstatement.

Unlike the issuance of the original policy, which the insurer was at liberty to refuse, no matter what the reason, its reinstatement rests on a contractual provision incorporated in the policy by legislative direction. The legislature has provided that every such policy shall contain, *inter alia*, a provision that, if there be a default in the payment of a stipulated premium, the policy "may be reinstated within three years from the default, upon evidence of insurability satisfactory to the company and payment of arrears of premiums, together with compound interest on the premiums and on all liens, if any." *R. S. 1937 17:34-15 (i)*. The policy here includes such provision except that the reinstatement period has been extended to five years; and it goes without saying that, upon compliance with the prescribed condition, the insured has an absolute right to reinstatement of the lapsed policy. It is to be observed that the statute makes no provision for answers to interrogatories submitted by the insurer as a *sine qua non* to reinstatement of a lapsed policy. As respects the insured's health, the prerequisite is "evidence of insurability satisfactory to the company."

"Insurability," within the purview of the cited provision, has been generally construed to mean "good health." This is the common and popular sense of the term. It could hardly have any other meaning. *Thompson v. Postal Life Insurance Co., 226 N. Y. 363; 123 N. E. Rep. 750; Equitable Life Assurance Society v. Wilson (Del.), 18 Atl. Rep. (2d) 240; Illinois Bankers Life Assurance Co. v. Palmer, 176 Okla. 514; 56 Pac. Rep. (2d) 370; Missouri Life Insurance Co. v. Hearne, 226 S. W. Rep. (Tex.) 789; Illinois Bankers Life Assurance Co. v. Payne, 93 S. E. Rep. (2d) (Tex.) 576; New York Life Insurance Co. v. Hanson, 2 N. W. Rep. (2d) 163; 71 N. D. 383; Officer v. New York Life Insurance Co., 73 Col. 495; 216 Pac. Rep. 253; Sussex v. Aetna Life Insurance Co., 38 Ont. L. R. 365; 38 D. L. R. 549.* It is a mere truism to say that the insurer may not arbitrarily refuse reinstatement. That is a substantial

property right created by the contract. The statute and the reinstatement clause measure the obligation. If the insurer ought in reason and justice to have been satisfied of insurability within the statutory view, the condition precedent to reinstatement was met. *Bradbury* v. *Mutual Reserve Fund Life Association, 53 N. J. Eq. 306,* reversed on other grounds *sub nom. Mutual Reserve Fund Life Association* v. *Bradbury, Id. 643; Van Houten* v. *Pine, 38 N. J. Eq. 72; Thompson* v. *Postal Life Insurance Co., supra; Illinois Bankers Life Assurance · Co.* v. *Payne, supra; Leonard* v. *Prudential Insurance Co., 128 Wis. 348; 107 N. W. 646.* Equity regards and treats as done what in good conscience ought to be done.

It is not requisite that the reinstatement partake of the elements of a binding contract. If the condition laid down in the statute and the stipulation made pursuant thereto is satisfied, reinstatement is the insured's of right. In such circumstances, reinstatement is but the rendition of a contractual duty grounded in the statute. The default did not work an absolute forfeiture of the policy; the right of reinstatement upon the statutory terms continued for the appointed period.

Here, the burden of proof is upon the insurer to establish non-insurability at the time of the reinstatement; and, in my view, it has not been sustained. Indeed, the learned Vice-Chancellor so found. He ruled in the course of the hearing that the insurer had not proved that, when the application for reinstatement was made, the insured was suffering from "heart disease." There is an utter lack of proof that, at that time, the insured was afflicted with myodegeneration, coronary sclerosis, angina pectoris, or any other ailment of the heart. Nor is it established that he was not in the same condition of health as at the time of the issuance of the policy, as stated in the answer to the first inquiry. The Vice-Chancellor also declared during the hearing that there was "no proof" that this question had not been "answered correctly."

Prior to June 18th, 1937, the insured's health was apparently good. His was a vigorous life without evidence of undue fatigue or physical weakness. He was engaged in the

retail hardware business; and he was accustomed to long hours of service and laborious work. He rarely found it necessary to have medical attention, and then only for minor indispositions. His physician, Dr. Krausz, first treated him on October 11th, 1935. A "thorough examination" revealed "no organic ailment." He was "anemic and nervous, but that was all." The insured testified that in June, 1937, a stepladder "moved" while he was ascending it, carrying a filled gallon paint container, and he fell and injured his right side, and fainted. Dr. Krausz was called and, at his suggestion, the insured accompanied him the next day to the Easton Hospital for an X-ray examination. He entered the hospital unassisted, and he returned home the same day and resumed his customary work in the store. He continued his usual activities without interruption until the first week of October, 1939. Dr. Krausz testified that the insured complained of pain "in the upper part of the abdomen, more to the right side." He found that his "heart sounds" were "not quite clear;" and he gave him a hypodermic to "relieve the pain." In his view, an electrocardiogram and an X-ray taken at the hospital revealed "predominance of the left ventricle of the heart," which "means * * * slight damage to the heart muscle." The heart muscle, he thought, had deteriorated "in a slight degree." He did not convey this opinion to the insured. He told a "member of the family" that "that is a slight trouble," and that the insured "should take it easy." He did not see the insured again until October 2d, 1938, when "he had the same kind of an attack," and after that, not until the fall of 1939. It is evident that in June, 1937, the physician was not convinced that the insured was afflicted with a heart ailment. He admited that he did not diagnose the condition as heart disease at that time. He said that that illness "might have been the forerunner" of his condition in October, 1939. Until the fall of 1939 he "was not so sure that the pains were due to his heart." He was then persuaded for the first time that the "previous attacks were due to this thing." But Dr. Krausz is a general practitioner. He had had no "experience with taking cardiographs or cardiograms or X-rays of the heart." He did not examine

the X-rays taken of the insured; he acted on "the report of the X-ray man," Dr. Zilessen. He did not "know much about electrocardiograms;" he "depended on Dr. Zilessen's diagnosis." He would not say that the cardiogram disclosed heart disease, but merely that the insured did not have "an ideal heart."

The insured undertook affirmatively to prove that he was not afflicted with heart disease at the time of the making of his application for reinstatement of the policy; and there is an overwhelming preponderance of the evidence in favor of this hypothesis.

Dr. Zilessen, whose findings were the basis of Dr. Krausz's conclusions, testified that he took the electrocardiograms, and that they disclosed that the insured had "slight hypertrophy of one part, but not of the whole heart," and that "that, in itself, does not indicate any heart disease or damage." The conditions found were "consistent with the heart of a man of Mr. Weiss' age." The electrocardiogram did not "indicate any cardiac disease." And Dr. Reichbaum and Dr. Parsonnet, specialists in diseases of the heart, gave convincing evidence that the insured was not, at the time of the hearing, a victim of heart disease. It was conceded that organic heart disease is progressive, and that, if the insured was so afflicted in June, 1937, there would be unmistakable indications of the condition at the time of their examinations prior to the hearing. These medical experts were in accord that the electrocardiograms taken on June 19th, 1937, disclosed no evidence whatever of heart disease. Dr. Reichbaum subjected the insured to a thorough physical examination on June 17th, 1940, before the commencement of this action. He gave him a fluoroscopic examination, and took an electrocardiogram of his heart. This showed "no change whatever" in the insured's "heart condition." Another cardiogram taken on January 27th, 1941, revealed "no evidence of the recognizable conditions which are shown by electrocardiography as heart disease;" and he was certain that the insured was not then suffering from heart disease. The "slight enlargement of the left ventricle," he said, "is a natural thing that occurs * * * as we get older."

He found no indication of heart disease in the X-ray. Dr. Parsonnet testified that there was "absolutely no evidence of heart disease" in the electrocardiograms or the X-rays taken on June 19th, 1937. This was likewise true of those taken on January 27th, 1941. The X-rays showed a normal heart for a man of his age. He examined the insured on January 4th, 1941. He took X-rays and scrutinized the cardiograms. His conclusion was that the insured was suffering from arthritis, with no heart disease, now or in the past. He testified: "I can answer with absolute certainty; this man has had no heart disease, and hasn't any." The pain was not the "kind of pain ordinarily associated with heart disease."

The testimony adduced from these three specialists was not controverted. The insurer did not seek a physical examination of the insured; and no counter-opinion evidence was introduced. This evidence must therefore be accepted as verity.

The so-called admissions by the insured in his application for disability benefits are not persuasive of the existence of a factual situation that would disentitle him to reinstatement of the policy. They are outweighed by the uncontroverted medical evidence. The application was prepared by members of the insured's family; and it is clear that its contents were grounded upon Dr. Krausz's diagnosis, which was largely predicated upon the subsequent history and is in the main unconvincing in view of the testimony given by the physicians expert in heart conditions and diseases. The admissions related by Dr. Lyon are in the same category.

And, by the same reasoning, the non-disclosure of Dr. Krausz's attendance upon the insured in June, 1937, did not constitute a false and fraudulent misrepresentation of a material fact, for that would not have led to a revelation of a state of health warranting the refusal of reinstatement of the policy. The false statement must also be material. *New York Life Insurance Co.* v. *Hanson, supra; Russell* v. *New York Life Insurance Co., 35 Idaho 774; 209 Pac. Rep. 273.* "The disclosure is not material unless there be revealed or found to exist during the attendance a physical condition

which is itself material." *Equitable Life Assurance Society* v. *Wilson, supra.* That would seem to be axiomatic.

We are controlled by the substance of the statute and the contract. The determinant is not the concealment *per se,* but rather the quality of the thing suppressed. The test is not the truthfulness of the answer to an inquiry as to whether there had been prior medical consultations, but the state of the insured's health when the petition for reinstatement was presented. Would the insurer here have then been warranted in denying reinstatement on grounds of non-insurability? Manifestly not. If the insured had made known the attendance of Dr. Krausz, that would not, as the evidence now reveals, have led to proof of non-insurability. It is to be borne in mind that non-insurability at the time of the application for reinstatement was pleaded in the bill, and that the insurer undertook to prove the allegation. The fundamental error of the decree, in my opinion, is that it disregards the essential distinction between the issuance of an original policy and the reinstatement of a policy lapsed for non-payment of the premium. It was plainly not the province of the insurer to make the truth of the insured's answers to interrogatories respecting prior medical attendance, treatments, or consultations determinative of the right of reinstatement, without regard to insurability at the time of the presentation of the application for reinstatement of the policy. The statute and the contract lay down insurability in fact as the exclusive criterion.

Even in the case of an original contract of insurance, an inquiry as to past medical attention and treatment does not call for a disclosure of medical consultations respecting indispositions in their nature merely transitory and temporary, and palpably not material to the risk—such as have no relation to general health or vital organic functions. *Urback* v. *Metropolitan Life Insurance Co., 130 N. J. Law 210. A fortiori* is this so as respects applications for reinstatement of a lapsed policy. The failure of the insured to disclose "trivial and temporary disorders," and the names of the physicians consulted, does not constitute a breach of a warranty relating to past sicknesses and the identity of the

attending physicians. A recital in the certificate of reinstatement that the insured is in "good health" cannot be construed to mean that he has had "no temporary or trivial indisposition." *Froehler* v. *North American Life Insurance Co., 374 Ill. 17; 22 N. E. Rep. (2d) 833; Franklin Life Insurance Co.* v. *Critz, 109 Fed. Rep. (2d) 417.*

Thus there was no misrepresentation of a material fact relating to the subject-matter of the application for reinstatement; and consequently there was ·no fraud practiced by the insured, either legal or· equitable.

Accordingly, I vote to reverse the decree and to remand the cause with direction to dismiss the bill of complaint.

Mr. Justice Perskie, Mr. Justice Porter, Judge Dear, Judge Rafferty and Judge Thompson join in this opinion.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, WELLS, HAGUE, JJ. 7.

*For reversal*—HEHER, PERSKIE, PORTER, DEAR, RAFFERTY, THOMPSON, JJ. 6.