NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3924-12T1


THOMAS DEMARCO and CYNTHIA
DEMARCO,

     Plaintiffs-Respondents,

v.

SEAN ROBERT STODDARD, D.P.M.,
Individually and t/a CENTER FOR
ADVANCED FOOT & ANKLE CARE, INC.,

     Defendant,

and

MEDICAL MALPRACTICE JOINT
UNDERWRITING ASSOCIATION OF
RHODE ISLAND,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **JANUARY 22, 2014**
>
> **APPELLATE DIVISION**

Argued October 15, 2013 — Decided January 22, 2014

Before Judges Yannotti, Ashrafi and
St. John.

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Docket No.
L-3309-11.

Todd J. Leon argued the cause for appellant
(Hill Wallack, L.L.P., attorneys; Mr. Leon
and Jonathan D. Pavlovcak, on the brief).

Michael D. Schottland argued the cause for respondents (Lomurro, Davison, Eastman & Munoz, P.A., attorneys; Michael J. Fasano, on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

This appeal concerns medical malpractice insurance coverage. Defendant Medical Malpractice Joint Underwriting Association of Rhode Island ("the JUA") appeals from summary judgment entered by the New Jersey Superior Court, Law Division, requiring that it provide liability coverage in the medical malpractice lawsuit filed by plaintiffs Thomas and Cynthia DeMarco against defendant podiatrist Sean Robert Stoddard. The JUA contends it justifiably rescinded the malpractice policy it had issued to Dr. Stoddard because the doctor purposely misrepresented the nature and location of his practice. Although the summary judgment record supports the JUA's allegation that Stoddard gave materially false information in his applications for the insurance policy and its annual renewals, we affirm the Law Division's judgment that the JUA must provide indemnification coverage for the DeMarcos' malpractice claims in the minimum amount required by New Jersey law.

I.

Viewed most favorably to the JUA, see R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), the summary judgment record reveals the following facts and procedural history.

Thomas DeMarco, a resident of New Jersey, was a patient of Dr. Stoddard from 2004 to 2011. Stoddard practiced podiatry at the Center for Advanced Foot & Ankle Care, located in Toms River and Lakewood, New Jersey. From 2007 through 2011, Stoddard was insured by medical malpractice liability policies issued by the JUA out of Rhode Island.

The Rhode Island legislature created the JUA, which is composed of private insurance carriers, so that Rhode Island doctors might obtain medical malpractice insurance if it is not otherwise available. R.I. Gen. Laws § 42-14.1-1. The JUA is required to provide coverage to qualified Rhode Island doctors. Essentially, its underwriting rules require only that the applicant be licensed to practice in Rhode Island and that at least 51% of the doctor's medical practice be generated in Rhode Island. The JUA provides policies to doctors who also practice in the adjacent states of Massachusetts and Connecticut, but it was not aware of any doctor it insured, other than Stoddard, who also practiced in New Jersey.

Stoddard initially applied for a JUA policy in January 2007 through an agent located in Rhode Island named Lisa O'Neil. O'Neil was not an employee of the JUA, as plaintiffs allege; she was an independent insurance broker. Stoddard alleged that O'Neil was responsible for the contents of his JUA application. According to O'Neil's deposition, the information on Stoddard's application was provided by him, and he had an opportunity to review the application before it was submitted to the JUA.

Stoddard's original January 2007 application stated that he was licensed to practice podiatry in both Rhode Island and New Jersey, that his office address was in Newport, Rhode Island, and that he was applying for affiliation with Newport Hospital in Rhode Island. But the office telephone numbers on the application contained a 732 area code, which is located in New Jersey. In response to the question: "Is at least 51% of your practice generated in Rhode Island?" the application checked off "yes," but that answer was false. Stoddard later admitted that at no time was a majority of his practice generated in Rhode Island.

Stoddard's annual renewal applications were also filed through O'Neil out of her Rhode Island office. The first two renewal applications, which covered the period through March 1, 2010, again contained a Newport, Rhode Island office address for

Stoddard, but once again with 732 office telephone numbers.  For the policy period most relevant to the DeMarcos' malpractice lawsuit, 2010-2011, Stoddard's renewal application contained a Lakewood, New Jersey, office address with the same 732 telephone number previously provided in the earlier applications.  All three renewal applications falsely answered the question "yes" as to Stoddard generating 51% of his practice in Rhode Island.  In fact, Stoddard never had any significant practice in Rhode Island.

In September 2010, Stoddard performed foot surgery on Thomas DeMarco in New Jersey.  In January 2011, Stoddard informed DeMarco that he was closing his practice in New Jersey and moving to California.  DeMarco's foot condition worsened, and he consulted another doctor.  In October 2011, DeMarco and his wife filed a medical malpractice lawsuit in New Jersey alleging that Stoddard had negligently performed the September 2010 foot surgery.

Stoddard received the summons and complaint in California, and submitted them to the JUA.  The JUA sent a reservation of rights letter back to Stoddard indicating it would not provide coverage if a majority of his practice was not generated in Rhode Island.  Shortly after that, Stoddard wrote to plaintiffs' attorney, stating: that he had moved to California and was

attempting to begin a new practice there in the form of a professional corporation; that the JUA had disclaimed coverage for the DeMarcos' malpractice lawsuit because of the 51% underwriting rule; that he had truthfully told the insurance broker O'Neil that the bulk of his practice was in New Jersey but he intended to build up a Rhode Island practice; that O'Neil had responded that Stoddard could apply to the JUA so long as he was making an effort to reach the 51% level of Rhode Island practice; that he was in fact never able to generate a significant practice in Rhode Island; and that he was currently going through a divorce and had no assets from which a malpractice judgment could be recovered personally from him.

On January 13, 2012, the JUA filed a complaint for a declaratory judgment in the superior court of Rhode Island. It sought rescission of Stoddard's last renewed policy on the ground that he had misrepresented material information in his application. Both Stoddard and the DeMarcos were named defendants in the JUA's Rhode Island complaint, but the JUA was never able to effect personal service of process on the DeMarcos. Neither Stoddard nor the DeMarcos filed an answer or otherwise defended the declaratory judgment action in Rhode Island. The DeMarcos' attorney wrote to counsel for the JUA contending that Rhode Island did not have personal jurisdiction

over the DeMarcos, and that the DeMarcos had never been in and had no other significant contacts with that state. Counsel for the JUA forthrightly revealed that information to the Rhode Island court.

On March 9, 2012, the DeMarcos filed an amended complaint in their New Jersey malpractice case. They named the JUA as a defendant and sought a declaratory judgment in New Jersey that the JUA must provide indemnification coverage on their medical malpractice claim against Stoddard.

On May 25, 2012, the court in Rhode Island entered default judgment against Stoddard, declaring the 2010-2011 renewed policy void. The judgment also stated that the JUA was not required to defend or indemnify Stoddard in the DeMarcos' New Jersey lawsuit. The Rhode Island court, however, did not enter a default judgment or take any other action against the DeMarcos.

Subsequently, the JUA and the DeMarcos filed cross-motions in the New Jersey malpractice case for summary judgment on the coverage question and on the effect of the Rhode Island default judgment. The New Jersey court heard argument and granted summary judgment in favor of the DeMarcos. It determined that the Rhode Island judgment was not binding on the DeMarcos and that the JUA was required to indemnify Stoddard in the DeMarcos'

lawsuit.  The court also granted the DeMarcos attorney's fees arising from successful litigation of the JUA's disclaimer of coverage.

We granted the JUA's motion for leave to appeal.  The trial court then stayed the underlying medical malpractice case between the DeMarcos and Stoddard pending the outcome of this appeal.

## II.

We first consider whether the default judgment entered by the Rhode Island court against Stoddard is binding on the DeMarcos.  We agree with the Law Division that it is not.

The Rhode Island court declined to grant the JUA's application to hold the DeMarcos in default and to enter judgment against them.  The JUA now argues that the Law Division in New Jersey erred in concluding that the Rhode Island court lacked jurisdiction, and also that the doctrines of res judicata and collateral estoppel bar the DeMarcos' New Jersey cause of action against the JUA.

We need not address the JUA's argument that the New Jersey Law Division incorrectly determined there was inadequate service of process for the Rhode Island court to obtain personal jurisdiction over the DeMarcos.  That issue is moot because the Rhode Island court did not exercise jurisdiction over them; it

did not enter default judgment or take any other action against the DeMarcos.

The doctrine of res judicata prevents the re-litigation of an issue once it has been fairly litigated and there is: "(1) a final judgment by a court of competent jurisdiction, (2) identity of issues, (3) identity of parties and (4) identity of the cause of action." Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 172-73 (App. Div.), certif. denied, 164 N.J. 188 (2000). Here, the first and third requirements are not satisfied. The Rhode Island court did not exercise personal jurisdiction over the DeMarcos, and they were never active parties in that litigation. There is no final judgment against the DeMarcos that can constitute res judicata.

Nor does the doctrine of collateral estoppel apply.

> Collateral estoppel, which is also known as issue preclusion, prohibits relitigation of issues if its five essential elements are met. Those elements are that
>
> > (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

> [Allen v. V & A Bros., Inc., 208 N.J. 114,
> 137 (2011) (quoting Olivieri v. Y.M.F.
> Carpet, Inc., 186 N.J. 511, 521 (2006)).]

"Although mutuality of parties no longer is an essential condition of collateral estoppel, the party against whom collateral estoppel is to be invoked must have been in 'privity' with a party in the first action." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 338 (1996) (citing Wunschel v. City of Jersey City, 96 N.J. 651, 658 (1984)). The JUA contends that the DeMarcos were in privity with Stoddard with respect to the coverage issue litigated in Rhode Island. We disagree.

"Generally, one person is in privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between the two as to represent the same legal right . . . ." Moore v. Hafeeza, 212 N.J. Super. 399, 403-04 (Ch. Div. 1986) (cited in Zirger, supra, 144 N.J. at 339). Here, the DeMarcos do not have such an identification of interest with Stoddard so that he represented the same legal right as them in the Rhode Island litigation.

The JUA's claim before the Rhode Island court was that Stoddard procured the policy through a material misrepresent-tation, which gave the JUA the right to rescind the policy. The DeMarcos are innocent third parties with respect to Stoddard's

misrepresentation. Although both Stoddard and the DeMarcos have an interest in coverage of the DeMarcos' malpractice claims by the JUA, it cannot be said that their legal rights were the same before the Rhode Island court. As the party that admittedly misrepresented the nature of his Rhode Island practice, Stoddard was not in a position to argue for the validity of the JUA policy. In fact, the Rhode Island court had personal jurisdiction over Stoddard, but he did not defend against the JUA's coverage action. Whether he believed he did not have an adequate defense or he did not feel compelled to defend the case given his personal financial circumstances, he did not represent the DeMarcos' interests.

In sum, the DeMarcos were not in privity with Stoddard and are not collaterally estopped from seeking a judgment contrary to the Rhode Island judgment entered against him. The Law Division correctly refused to enforce the Rhode Island judgment.

### III.

On the merits of the DeMarcos' New Jersey judgment requiring insurance coverage, we must decide whether the law of New Jersey or that of Rhode Island applies. The Law Division concluded that New Jersey law applies on the issue of whether the JUA could disclaim coverage of the DeMarcos' claims.

The DeMarcos contend the JUA should not be permitted to argue that Rhode Island law applies because it did not raise the choice-of-law issue in its pleadings or motion for summary judgment. A trial court, however, has discretion to permit a party to raise a choice-of-law issue even if it was not raised earlier. See Rowe v. Hoffman-La Roche Inc., 383 N.J. Super. 442, 450-51 (App. Div. 2006), rev'd on other grounds, 189 N.J. 615 (2007). In this case, the Law Division did not err in undertaking to determine the threshold choice-of-law issue, and the JUA may now appeal from that ruling.

Nor is the JUA judicially estopped from arguing that Rhode Island law should apply on the ground that it was willing to accept application of New Jersey law in the trial court. "[J]udicial estoppel is an extraordinary remedy and should be invoked only when a party's inconsistent behavior will otherwise result in a miscarriage of justice." Ramer v. N.J. Transit Bus Operations, Inc., 335 N.J. Super. 304, 313 (App. Div. 2000) (internal quotation marks omitted). Judicial estoppel may be applied when a party prevailed in an earlier proceeding on the basis of a position that is inconsistent with its current position. See McCurrie ex rel. Town of Kearny v. Town of Kearny, 174 N.J. 523, 533-34 (2002).

Here, the JUA has not taken inconsistent positions.  It argues before us that it is not liable to the DeMarcos under either New Jersey or Rhode Island law.  Moreover, the JUA did not successfully assert any position that the Law Division accepted.  See Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606-07 (App. Div. 2000) ("[T]o be estopped [a party must] have convinced the court to accept its position in the earlier litigation.  A party is not bound to a position it unsuccessfully maintained."), certif. denied, 167 N.J. 88 (2001).  Judicial estoppel does not bar the JUA's choice-of-law arguments on appeal.

                                B.

We exercise plenary review of a trial court's ruling on a choice-of-law issue.  Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 418 (App. Div. 2011), certif. denied, 210 N.J. 478 (2012); Dolan v. Sea Transfer Corp., 398 N.J. Super. 313, 321 (App. Div.), certif. denied, 195 N.J. 520 (2008).

The first step in a choice-of-law analysis is to "determine whether an actual conflict exists" by comparing the potentially applicable laws of the two jurisdictions.  P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008).  If the laws of the two jurisdictions do not differ significantly, then there is no choice-of-law issue to be resolved, and the forum state applies

its own law.  Rowe, supra, 189 N.J. at 621; Gantes v. Kason Corp., 145 N.J. 478, 484 (1996).  The party seeking application of the foreign law must demonstrate that the laws of the two jurisdictions differ.  Pressler & Verniero, Current N.J. Court Rules, comment 6.1 on R. 4:5-4 (2014).

The precise question before us is whether a medical malpractice insurance carrier may rescind a policy so that the carrier has no duty to indemnify the insured doctor for injuries suffered by an innocent third party who made a malpractice claim before the policy was rescinded.  We have no statutes or cases directly on point to inform us, but we suspect that both New Jersey and Rhode Island would protect the interests of innocent third parties.  Analogous case law of both states suggests that both would restrict the rescission remedy available to insurance carriers in order to provide some protection to innocent third parties for whose benefit compulsory insurance laws were enacted.  Nevertheless, we see some differences between the laws of the two states.

In the field of automobile insurance, New Jersey courts have held that the rescission remedy available to insurance carriers when a policy was procured by means of a material misrepresentation may not infringe upon the rights of innocent third parties who might need to rely on insurance coverage to

compensate them for their injuries.  See, e.g., <u>Rutgers Cas.</u>
<u>Ins. Co. v. LaCroix</u>, 194 <u>N.J.</u> 515, 524-31 (2008); <u>Fisher v. N.J.</u>
<u>Auto. Full Ins. Underwriting Ass'n</u>, 224 <u>N.J. Super.</u> 552, 557-59
(App. Div. 1988).  Our courts distinguish between the wrongdoing
insured, who procured the policy fraudulently or otherwise
failed to comply with the terms of the policy, and an innocent
third party, who had nothing to do with the fraud or breach of
the policy.  <u>Dillard v. Hertz Claim Mgmt.</u>, 277 <u>N.J. Super.</u> 448,
450-54 (App. Div. 1994), <u>aff'd o.b.</u>, 144 <u>N.J.</u> 326 (1996);
<u>Fisher</u>, <u>supra</u>, 224 <u>N.J. Super.</u> at 557-58.

Because New Jersey mandates auto insurance coverage,
innocent third parties who use the roadways can reasonably
expect that other motorists will comply with the law and be
covered by a liability policy.  <u>Marotta v. N.J. Auto. Full Ins.</u>
<u>Underwriting Ass'n</u>, 280 <u>N.J. Super.</u> 525, 532 (App. Div. 1995),
<u>aff'd o.b.</u>, 144 <u>N.J.</u> 325 (1996).  Consequently, our courts have
refused to declare an auto policy void from its inception and in
its entirety as to injured third parties who did not benefit
from the fraud committed in procuring the policy.  Instead, the
voided policies are reformed to provide the minimum liability
coverage mandated by law.  See <u>Citizens United Reciprocal Exch.</u>
<u>v. Perez</u>, 432 <u>N.J. Super.</u> 526, 532-34 (App. Div. 2013); <u>N.J.</u>

Mfrs. Ins. Co. v. Varjabedian, 391 N.J. Super. 253, 256-57 (App. Div.), certif. denied, 192 N.J. 295 (2007).[1]

The distinction between the insured as the wrongdoer and an innocent third party has also been significant in the context of a legal malpractice policy. First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 143 (2003). In Lawson, two title insurance companies sought reimbursement from a law firm's malpractice carrier for claims they had paid when lawyers at the firm misappropriated the firm's trust funds in real estate transactions. Id. at 133-34. Our Supreme Court held that the legal malpractice coverage could be voided from the inception of the policy for two attorneys in the firm because they had misrepresented the existence of pending claims when they applied for the policy. The Court further held that the policy could be voided for the law firm itself, but not with respect to an innocent third attorney in the firm because that attorney was not involved in any wrongdoing. Id. at 140-43.

Both sides in this appeal cite Lawson as favoring their positions on rescission of the JUA medical malpractice policy.

---

[1] Another way of explaining the law is that the rescission remedy available to the defrauded insurance carrier is "molded and shaped" by the court under equitable principles so that innocent third parties do not lose the benefits of mandatory insurance protection. See Citizens United Reciprocal Exch., supra, 432 N.J. Super. at 538 (Ashrafi dissenting) (quoting LaCroix, supra, 194 N.J. at 528-29).

The DeMarcos focus on their status as innocent parties in the perpetration of the alleged fraud by Stoddard and his insurance agent, O'Neil. On the other hand, the JUA points out that the Supreme Court in Lawson allowed rescission of coverage with respect to the wrongdoing lawyers, which necessarily included coverage for claims of their innocent clients. Id. at 141-42. The Court only mandated that coverage be available for any potential claims of the innocent third attorney's clients. Id. at 143.

A noteworthy distinction between Lawson and this case is that the innocent clients of the wrongdoing lawyers had already recovered their losses from the title insurance companies. The claims against the malpractice carrier were not brought by the law firm's clients but by the title insurance companies that were seeking to pass on their liability on the risks to the malpractice carrier. On the subject of innocent clients, the Court referred only generally to the "policies underlying our Rules of Court that seek to protect consumers of legal services by requiring attorneys to maintain adequate insurance."[2] Lawson, supra, 177 N.J. at 143 (citing Fisher, supra, 224 N.J. Super. at 557-58). The Court emphasized that the rescission remedy

---

[2] Rules 1:21-1B(a)(4) and 1:21-1C(a)(3) of our Court Rules require that law firms formed as limited liability companies or limited liability partnerships maintain malpractice insurance.

depends on equitable principles — "the totality of circumstances in a given case," including the Court's "concern for the public." Id. at 143-44.

Because the Court ultimately did not address the question that is before us, the JUA's reliance on Lawson is misplaced. The reasoning of the auto insurance cases more aptly applies to the circumstances of this case. Like auto insurance, medical malpractice insurance is mandatory in New Jersey. N.J.S.A. 45:9-19.17(a); N.J.S.A. 45:5-5.3(a). In the same way as the general public that uses our roadways, see Marotta, supra, 280 N.J. Super. at 532, medical patients can reasonably assume New Jersey doctors are complying with the law and carrying compulsory malpractice insurance. Insurance coverage in at least the minimum compulsory amount should remain available for the benefit of innocent patients who suffered injuries when the policy was in effect.

The rescission remedy available to an insurance carrier may preclude the insured doctor from demanding coverage when he gave materially false information in his application for insurance, but that remedy does not permit a malpractice policy to be voided from its inception and in its entirety when an innocent patient seeks coverage. See Dillard, supra, 277 N.J. Super. at 451. The statutory minimum coverages under our state laws are

not subject to post-claim rescission by the insurance carrier because of the insured's fraud in procuring the policy.

The Rhode Island Supreme Court has issued decisions in the context of automobile insurance that suggest it may decide the issue of coverage in the same way. Although the superior court of Rhode Island in the JUA's declaratory judgment action entered a default judgment declaring that the JUA was not obligated to provide coverage for the DeMarcos' lawsuit, the matter was uncontested, and the court did not issue an opinion supporting its judgment. Moreover, the judgment addressed only Stoddard's right to demand a defense and indemnification. In the default situation presented, we cannot say that the Rhode Island trial court's judgment represents the law of that state with respect to the rights of innocent third parties such as the DeMarcos.

To our reading, the published Supreme Court case law in Rhode Island indicates an inclination to protect the rights of innocent parties where compulsory insurance is involved. In Ryan v. Knoller, 695 A.2d 990, 995-96 (R.I. 1997), the holding of the Rhode Island Supreme Court is similar to the New Jersey auto insurance cases we have cited. In Ryan, the plaintiff was injured by an intoxicated driver who was driving a rented car. The rental company's insurance policy contained an "intoxication exclusion" that absolved the carrier of an obligation to cover

A-3924-12T1

the driver's liability.  Id. at 991.  The court held that coverage had to be provided for the innocent injured party.  It stated that in situations where "the purpose of statutorily required insurance coverage is intended for the protection of the public, that purpose may not be thwarted by permitting an insurer to avail itself of technical defenses included in its policy relating to conditions whose performance is wholly beyond the ability of the injured person to control."  Id. at 992.  The court held that the intoxication exclusion was against public policy and not enforceable against an innocent injured third party.  Id. at 995.

In a second auto insurance case decided on the same day and written by the same justice, Ogunsuada v. Gen. Accident Ins. Co. of Am., 695 A.2d 996 (R.I. 1997), the Rhode Island Supreme Court reached a result that, on the surface, may seem inconsistent with its holding in Ryan.  It declined to distinguish between the wrongdoing insured and the innocent injured party who had no control over the wrongdoing.

The plaintiff in Ogunsuada was injured by an insured motorist who subsequently breached a "cooperation clause" in his insurance policy.  After the insurance carrier withdrew from providing a defense and indemnification for its non-cooperating insured, the injured plaintiff obtained a default judgment

against the insured tortfeasor.  Id. at 997-98.  The plaintiff then sought recovery of his judgment from the insurance carrier under a Rhode Island statute that permits a direct action against the carrier after judgment is first obtained against the insured tortfeasor.  Id. at 998 (citing R.I. Gen. Laws § 27-7-2).  The Rhode Island Supreme Court held that a judgment-creditor, seeking to recover from a judgment-debtor's insurer, "stands in the shoes of the defendant's insured and is subject to any defenses that the insurer would have against its insured."  Id. at 999.  The court held that the injured "plaintiff bore the burden of proving that [the insured] had substantially complied with the cooperation provision in his liability insurance contract, that any failure on his part to do so was either excused or waived, or that his failure to comply was not prejudicial to the defendant insurer."  Ibid.

Both Ryan and Ogunsuada involved wrongdoing by the insured driver that was wholly outside the control of the innocent third party.  In Ryan the court held that the carrier could not disclaim coverage while in Ogunsuada the court held that the carrier could use any defense it had available against the insured.  However, in Ogunsuada the court also noted a distinction between parts of the subject insurance policy that pertained to a compulsory insurance law and those that pertained

21                                          A-3924-12T1

only to optional insurance. Id. at 1001. It did not need to, and in fact did not, hold that compulsory insurance coverage could be denied to the innocent third party on the ground that the insured had breached the terms of his policy.

We read the Ryan and Ogunsuada decisions together to conform to an underlying principle that an innocent party will be protected in circumstances where compulsory insurance laws require coverage, but that otherwise, the insurance carrier may rely on defenses that are not contrary to the public policy of the state. As far as compulsory auto insurance coverage is concerned, New Jersey and Rhode Island law are not substantially different. The resulting question, however, is whether New Jersey and Rhode Island both have laws that make medical malpractice insurance compulsory.

New Jersey requires that doctors carry malpractice insurance of at least one million dollars coverage per occurrence, or if insurance coverage is not available, doctors must demonstrate their financial responsibility with a letter of credit of at least $500,000. N.J.S.A. 45:9-19.17(a). Podiatrists in New Jersey are required to carry either a malpractice policy or, if one is not available, a letter of credit in "the minimum amount required by the State Board of Medical Examiners." N.J.S.A. 45:5-5.3(a). The New Jersey

Legislature enacted these laws to "ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a physician or podiatrist is found responsible for acts of malpractice."  S. Health Comm. Statement to S. 267 (N.J. 1996), available at http://law. njstatelib.org/law_files/njlh/lh1997/L1997c365.pdf.

While the Rhode Island legislature has also considered the question of mandatory malpractice insurance, it has not directly compelled coverage in any specific amount.  Instead, its statute requires that the state's "director of business regulation" promulgate regulations regarding malpractice insurance coverage. R.I. Gen. Laws § 42-14.1-2.  Furthermore, the Rhode Island statute sets a floor of $100,000 coverage, ibid., in comparison to the million dollars of minimum coverage required by the New Jersey statute, N.J.S.A. 45:9-19.17(a).  At the time of the summary judgment motions in this case, no regulations had been promulgated in Rhode Island mandating malpractice insurance coverage for doctors.  See Insurance Regulation 21 — Medical Malpractice Insurance, R.I. Gen. Laws § 42-14.1-2 (proposed Sept. 2007).[3]

---

[3] Public notice of Proposed Rule-Making, implementing minimum medical malpractice insurance requirements, Section 5, available at http://www.dbr.state.ri.us/documents/rules/proposed/2013-propd21.pdf (last visited Dec. 30, 2013).

Although New Jersey and Rhode Island may come to the same conclusion on limiting the rescission remedy to protect innocent third parties, the laws of the two states are sufficiently different with respect to compulsory insurance coverage that a choice-of-law analysis and ruling is required in this case.

C.

The next step in our analysis is to evaluate the facts of the case under the proper New Jersey choice-of-law standard since, generally, the forum state applies its own conflicts law. Erny v. Estate of Merola, 171 N.J. 86, 94 (2002). The parties agree that, in deciding which state's law should apply, New Jersey no longer follows traditional concepts of lex loci delicti[4] for torts, see, e.g., Veazey v. Doremus, 103 N.J. 244, 247-49 (1986); Mellk v. Sarahson, 49 N.J. 226, 228-29 (1967), and lex loci contractus[5] for insurance contracts, see, e.g., State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 36-37 (1980). Instead, we have employed "a more flexible 'governmental-interest' standard, applying the law of the state with the greatest interest in, or most significant connections with, the issues raised or the parties and the transaction."

---

[4] "The law of the place where the tort or other wrong was committed." Black's Law Dictionary 930 (8th ed. 2004).

[5] "The law of the place where a contract is executed or to be performed." Black's Law Dictionary 930 (8th ed. 2004).

<u>Lonza, Inc. v. The Hartford Accident & Indem. Co.</u>, 359 <u>N.J.</u> <u>Super.</u> 333, 342 (App. Div. 2003).

More recently, the New Jersey Supreme Court has referred to the analysis as a "most significant relationship test." <u>Camp Jaycee</u>, <u>supra</u>, 197 <u>N.J.</u> at 135-36; <u>see also</u> <u>id.</u> at 156-63 (Hoens, J. dissenting) (describing the "most significant relationship test" as distinct from and less preferable to the "governmental interest test," the latter focusing on the conflicting public policies of the two jurisdictions).

In this case, the JUA emphasizes its own expectations and argues that the interests of Rhode Island in regulating the JUA's insurance contracts are predominant and therefore Rhode Island law should apply. The DeMarcos, in turn, emphasize their expectations when they engaged Stoddard to perform surgery, and they argue that they and New Jersey have a greater interest in protecting those who seek medical services in this state.

In <u>Camp Jaycee</u>, <u>supra</u>, the Court started with a presumption that the law of the state where the injury occurred applies. 197 <u>N.J.</u> at 136, 141. The Court then considered general principles addressed in section 6 and other sections of the <u>Restatement (Second) of Conflict of Laws</u> ("<u>Restatement</u>") (1971). <u>Camp Jaycee</u>, <u>supra</u>, 197 <u>N.J.</u> at 140-42. In the context of conflicting state laws on charitable immunity, the <u>Camp Jaycee</u>

Court evaluated the specific facts of the case and concluded that the interests and laws of the state where the injury occurred were controlling.  Id. at 151-52.

The JUA argues that Camp Jaycee does not apply here because it was purely a tort case while this case is primarily a contract case pertaining to either enforcement or rescission of an insurance contract.  The JUA argues that the more relevant precedent is Simmons, supra, 84 N.J. at 37, where the Court discussed a conflict of laws in the context of insurance coverage as a contract case rather than as a tort case.

In Simmons, too, the Court referenced applicable sections of the Restatement, specifically, sections 6, 188, and 193. Simmons, supra, 84 N.J. at 34-35.  Most significant, section 193 of the Restatement provides:

> The validity of a contract of fire, surety
> or casualty insurance and the rights created
> thereby are determined by the local law of
> the state which the parties understood was
> to be the principal location of the insured
> risk during the term of the policy, unless
> with respect to the particular issue, some
> other state has a more significant relation-
> ship under the principles stated in § 6 to
> the transaction and the parties, in which
> event the local law of the other state will
> be applied.

> [(Emphasis added).]

Notably, the Restatement commentary to section 193 identifies that section as applicable to "such questions as whether a false

statement made by the insured to the company bars recovery upon the policy." Comment a to Restatement § 193. The commentary also recognizes that the "principal location of the insured risk" may be in more than one jurisdiction, in which case, "[t]he importance of the risk's principal location" will have less significance in deciding a choice-of-law issue. Id. comment b.

The Court in Simmons acknowledged the overlap of contract and tort law in the context of liability insurance coverage. It held that, while the place where the insurance contract was issued "ordinarily governs the choice of law," that rule

> should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.
>
> [Simmons, supra, 84 N.J. at 37.]

The Supreme Court also referenced Restatement § 193 in Gilbert Spruance Company v. Pennsylvania Manufacturers' Association Insurance Company, 134 N.J. 96, 107 (1993), which was an insurance coverage dispute in an environmental contamination case. The Court stated that an insurance policy "should be interpreted under the substantive law of the state

that the parties understood to be the principal location of the insured risk, unless another state has a more significant relationship to the parties, the transaction, and the outcome of the controversy."  When making this determination, "courts should rely on the factors and contacts set forth in Restatement sections 6 and 188."[6]  Id. at 102-03.

---

[6] Restatement § 6 lists the following seven factors as relevant to the choice-of-law issue:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

More specifically, with respect to contracts, section 188 provides:

> [T]he contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(continued)

A-3924-12T1

In Lonza, we followed our Supreme Court's lead and reformulated the seven factors listed in Restatement § 6 as follows: "(1) the competing interests of the relevant states, (2) the national interests of commerce among the several states, (3) the interests of the parties, [and (4)] the interests of judicial administration."  Lonza, supra, 359 N.J. Super. at 347-48 (quoting Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 197-98 (1998)).  Contrary to the JUA's contentions, our application of the reformulated section 6 factors and the relevant contacts listed in section 188, leads us to conclude that New Jersey law should apply in this case.

(1) Competing interests of the states.  New Jersey has a strong interest in ensuring that all doctors who practice in

_____

(continued)

       (a) the place of contracting,

       (b) the place of negotiation of the contract,

       (c) the place of performance,

       (d) the location of the subject matter of the contract, and

       (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

       These contacts are to be evaluated according to their relative importance with respect to the particular issue.

this state maintain malpractice insurance.  It has enacted a statute mandating malpractice coverage so that patients who use medical services in this state can be protected.  Rhode Island has an interest in ensuring that its JUA is used for its proper purposes — to provide malpractice insurance for Rhode Island doctors and not for doctors who practice primarily in another state.

The JUA, however, was in a much better position than the DeMarcos to protect the interests of both states by ensuring that Stoddard was qualified to receive a JUA policy.  All that was required was that the JUA examine Stoddard's applications and follow up on any apparent discrepancies, such as the absence of a telephone number for a Rhode Island office.

In addition, the JUA undertook to provide insurance coverage for out-of-state patients comprising up to 49% of a Rhode Island doctor's practice.  It must therefore abide the potential application of the laws of other jurisdictions to its coverage obligations.

(2) The interests of commerce among the states.  The inquiry pertinent to this factor should focus on whether the application of one state's law would frustrate the policies of the other state.  Lonza, supra, 359 N.J. Super. at 348 (quoting Pfizer, supra, 154 N.J. at 198-99).  New Jersey has a policy of

protecting innocent injured parties.  See, e.g., Lawson, supra, 177 N.J. at 143; Fisher, supra, 224 N.J. Super. at 557-58.  That policy would be frustrated by application of Rhode Island's law, if it is interpreted not to provide similar protection to innocent medical patients.  Since Rhode Island may also have such a policy of protecting innocent patients, at least in circumstances where insurance coverage is compulsory, see Ryan, supra, 695 A.2d at 995, application of New Jersey's law in this context is less likely to offend the public policy of Rhode Island.

(3) The interests of the parties.  The justified expectations of the parties are of considerable importance.  See Restatement § 188 (comment b); Lonza, supra, 359 N.J. Super. at 348 (quoting Pfizer, supra, 154 N.J. at 198-99).  In evaluating the parties' expectations, the relevant contacts listed in section 188 (see supra, footnote 6) should be analyzed, taking account of their relative importance in these factual circumstances.

Here, Rhode Island is the place of the insurance contract, as well as the location of one of the contracting parties. Significantly, all other contacts point to New Jersey.

Stoddard's practice was actually located in New Jersey.  On the last of the renewal applications, the one that the JUA

rescinded, Stoddard listed his office address in Lakewood, New Jersey. In fact, the earlier applications provided clues that Stoddard was actually practicing in New Jersey, not in Rhode Island. They all contained a New Jersey office telephone number.

Furthermore, the JUA had constructive knowledge all along that up to 49% of Stoddard's practice was located in New Jersey and not in Rhode Island. Consequently, the place of performance of activities covered by the insurance contract included a significant level of practice in New Jersey. The location of the risk the JUA undertook to cover was not just in Rhode Island.

The JUA nevertheless entered into the insurance contract and agreed to cover all of Stoddard's medical practice, in both Rhode Island and New Jersey. When an insurance contract protects against a localized risk, the state where the risk is located has a significant interest in application of its own laws. Comment e to Restatement § 188. The JUA had ample information that it was subjecting its insurance contract to the laws of a jurisdiction other than Rhode Island when it accepted premium payments from Stoddard and provided him with liability coverage for his New Jersey practice as well as his purported

A-3924-12T1

51% or more practice in Rhode Island. The JUA's interests were not tied exclusively to Rhode Island and its laws.

On the other hand, the DeMarcos never ventured outside New Jersey in seeking medical services from Stoddard. They are residents of New Jersey who sought the care of a doctor in this State. The allegedly negligent surgery was performed in New Jersey. The DeMarcos have a strong interest in the application of this State's laws to their claims against Stoddard and the insurance carrier that provided him with liability coverage as mandated by New Jersey law. Their interests in application of New Jersey laws clearly predominate over those of the JUA in application of Rhode Island laws.

(4) The interests of judicial administration. The inquiry for this factor is whether choosing either competing state's law will foster or hinder a fair, just, and timely disposition of the controversy. Lonza, supra, 359 N.J. Super. at 348 (quoting Pfizer, supra, 154 N.J. at 198-99). This factor is particularly important when there are numerous parties and the issues before the court are complex. Ibid. In this case, there are only three parties, and the issues do not reach the complexity of insurance coverage in an environmental contamination or similar multi-state, multi-party case. We give this factor minimal weight.

Our analysis of the factors and contacts derived from the Restatement leads us to conclude that New Jersey has a more significant relationship, and a greater governmental interest, in the application of its laws to this coverage dispute than does Rhode Island.  To the extent there are differences in the laws of the two states, New Jersey law shall apply to the coverage dispute.

We have already determined in the prior section of this opinion that New Jersey law requires the JUA's rescission remedy be limited so that it does not apply to the DeMarcos' claims. We conclude that the Law Division correctly granted summary judgment to the DeMarcos requiring liability coverage in the minimum amount mandated by New Jersey statute, one million dollars, N.J.S.A. 45:9-19.17.  If the DeMarcos prevail in their malpractice case against Stoddard, the JUA must indemnify Stoddard up to that amount.

                                IV.

Finally, the JUA challenges the award of attorney's fees to the DeMarcos for prevailing on the coverage issue.

Rule 4:42-9(a)(6) allows a court to award attorney's fees "[i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant."  The rule includes an action brought by a third-party beneficiary of a

liability insurance contract.  Myron Corp. v. Atlantic Mut. Ins. Corp., 407 N.J. Super. 302, 311 (2009), aff'd o.b., 203 N.J. 537 (2010).

The JUA argues that the granting of attorney's fees is not mandatory and that its defense of the DeMarcos' complaint was not a "groundless disclaimer" of insurance coverage.  It argues further that attorney's fees are not warranted because the case involved a "novel" issue "worthy of consideration."  See Messec v. USF&G Ins. Co., 369 N.J. Super. 61, 64 (App. Div.), certif. denied, 181 N.J. 287 (2004).  While we do not disagree factually with these contentions, they do not preclude the award of attorney's fees.

First, although not mandatory, a court can grant attorney's fees when such an award is authorized and the court finds it appropriate to do so.  Shore Orthopaedic Grp. v. Equitable Life Assur. Soc'y of U.S., 397 N.J. Super. 614, 623 (App. Div. 2008), aff'd o.b., 199 N.J. 310 (2009).  "The decision to award counsel fees rests within the sound discretion of the trial court." Ibid.  Second, bad faith is not a prerequisite to an attorney's fee award under Rule 4:42-9(a)(6).  Sears Mortg. Corp. v. Rose, 134 N.J. 326, 356 (1993); Myron Corp., supra, 407 N.J. Super. at 310-11.  Finally, unlike Messec, supra, 369 N.J. Super. at 64, this was not a coverage dispute between two insurance carriers

and in which we were affirming the trial court's discretionary decision to deny attorney's fees. Rather, "the insurer ha[d] refused to provide coverage or to indemnify or defend its insured," ibid., and we are reviewing the trial court's decision to award fees.

Where a trial court has authority to grant attorney's fees, we grant it broad discretion and will not disturb its decision unless there has been a clear abuse of that discretion. Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 25 (2004); Rendine v. Pantzer, 141 N.J. 292, 317 (1995). Here, the DeMarcos successfully litigated the action and prevailed on a judgment declaring that the JUA is obligated to provide coverage for their malpractice claims against Stoddard. The Law Division did not abuse its discretion in granting them attorney's fees.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION