Justice ALBIN,
dissenting.
All physicians and podiatrists who practice medicine in New Jersey are required to maintain at least $1,000,000 in medical malpractice insurance or a $500,000 letter of credit. N.J.S.A. 45:9-19.17(a); N.J.S.A. 45:5-5.3; N.J.A.C. 13:35-6.18. The purpose of this compulsory insurance law is to ensure that patients can secure financial compensation in the event of a doctor’s professional negligence. Every patient has a right to presume that his physician is in compliance with the law.
*385 In this case, defendant Dr. Sean Stoddard, a podiatrist, misrepresented to his medical malpractice insurer — the Medical Malpractice Joint Underwriting Association of Rhode Island (RIJUA)— that the majority of his podiatry practice was in Rhode Island, rather than New Jersey. During the period the RIJUA insured him, Dr. Stoddard performed foot surgery on plaintiff Thomas DeMarco (DeMarco). In a medical-malpractice action, DeMarco sought damages from Dr. Stoddard for worsening his medical condition. In addition, DeMarco’s wife filed a loss-of-consortium claim. After the DeMarcos filed their lawsuit, the RIJUA can-celled Dr. Stoddard’s malpractice insurance. The RIJUA claims that its insurance contract with Dr. Stoddard should not only be rescinded, but also that the rescission should be backdated, thus denying the DeMarcos the protection of the insurance coverage that was in effect at the time of the allegedly botched surgery.
I agree with the majority’s conclusion that New Jersey law applies to the DeMarcos’ lawsuit. I disagree that under this State’s law, the medical-malpractice carrier in this case can retroactively cancel malpractice insurance to deny an innocent patient coverage for a physician’s professional negligence. The approach taken by the majority is at complete odds with our State’s public policy, which finds expression in our compulsory medical malpractice insurance law. The aim of the law is to provide financial protection to every patient in this State.
The RIJUA was in the best position to ferret out any misrepresentation made by Dr. Stoddard when he applied and reapplied for malpractice insurance coverage. The innocent patient was in no position to do so.
I would require the insurer to provide coverage up to $500,000 to DeMarco and his wife. After all, DeMarco underwent surgery with Dr. Stoddard when he was lawfully insured — that is, before the carrier backdated the rescission. At the time of DeMarco’s surgery, the RIJUA, in effect, represented to the world that it was insuring Dr. Stoddard against claims of negligence. The public had the right to rely on that representation. By requiring cover *386 age, the equities of all parties are balanced, and the patient receives the benefit of the financial security intended by the law.
Because the majority has taken the path that leaves the innocent patient without compensation for his injuries and rewards the insurance company for its lack of due diligence, I respectfully dissent.
I.
In this case, Dr. Stoddard purchased medical malpractice insurance from the RIJUA. In his application, he misrepresented the primary location of his practice. From 2007 until 2011, Dr. Stoddard represented to the RIJUA that at least fifty-one percent of his podiatry practice was generated in Rhode Island — a prerequisite to receiving the RIJUA’s insurance coverage. Dr. Stoddard’s Rhode Island practice, however, never met the RIJUA’s fifty-one percent requirement.
In each of his insurance applications from 2007 through 2010, Dr. Stoddard indicated that his office was located in Rhode Island, although he did list his telephone and fax numbers as having a 732 New Jersey area code, which should have signaled that he had a New Jersey office. In Dr. Stoddard’s renewal application for March 2010 to March 2011, he gave 1195 Highway 70, # 12, Lakewood, New Jersey as the address for his office. Once again, he provided a New Jersey telephone number. The RIJUA was on notice that Dr. Stoddard had a New Jersey practice when he performed surgery on DeMarco in September 2010.
Only after October 2011, when the DeMarcos filed a medical malpractice lawsuit alleging that Dr. Stoddard negligently performed surgery, did the RIJUA rescind its insurance policy on the basis that the majority of Dr. Stoddard’s podiatry practice was not situated in Rhode Island, as represented in his malpractice-insurance applications. The RIJUA returned Dr. Stoddard’s premium payments for the period from March 2010 to January 2011, but kept the premiums paid from 2007 through February 2010. Dr. Stoddard informed DeMarco that he had no assets. DeMarco *387 and his wife then amended their complaint seeking the payment of damages from the RIJUA on the malpractice claim.
Both the trial court and the Appellate Division in a well-reasoned opinion, DeMarco v. Stoddard, 434 N.J.Super. 352, 84 A.3d 965 (App.Div.2014), held that the RIJUA was required to provide coverage of $1,000,000 should Dr. Stoddard be found liable on the malpractice claim.
II.
A.
All physicians and podiatrists who practice medicine in New Jersey are required to maintain medical malpractice liability insurance. N.J.S.A. 45:9 — 19.17(a); N.J.S.A. 45:5-5.3. According to N.J.S.A. 45:9-19.17(a),
[a] physician who maintains a professional medical practice in this State and has responsibility for patient care is required to be covered by medical malpractice liability insurance issued by a carrier authorized to write medical malpractice liability insurance policies in this State, in the sum of $1,000,000 per occurrence and $3,000,000 per policy year and unless renewal coverage includes the premium retroactive date, the policy shall provide for extended reporting endorsement coverage for claims made policies, also known as “tail coverage,” or, if such liability coverage is not available, by a letter of credit for at least $500,000.
The requirement that physicians and podiatrists maintain $1,000,000 in coverage per occurrence or $500,000 by a letter of credit is “to ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a physician or podiatrist is found responsible for acts of malpractice.” Assembly Health Comm., Statement to S. 267 (Sept. 19, 1996). The clear intent of the legislation is to provide financial protection to patients who suffer preventable injuries at the hands of their doctors.
The question in this case is whether a medical-malpractice insurer may avoid paying damages to an innocent patient when the rescission of the physician’s insurance policy is backdated, thus denying the patient the benefit of the coverage in effect at the time the malpractice occurred.
*388 B.
“[A] material factual misrepresentation made in an application for insurance may justify rescission if the insurer relied upon it to determine whether or not to issue the policy.” Remsden v. Dependable Ins. Co., 71 N.J. 587, 589, 367 A.2d 421 (1976); see also Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 527-28, 946 A.2d 1027 (2008); Mass. Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 111, 584 A.2d 190 (1991); N.Y. Life Ins. Co. v. Weiss, 133 N.J. Eq. 375, 379-80, 32 A.2d 341 (1943). Rescission of the contract prevents an insured from directly benefítting from his misrepresentation. Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 612, 560 A.2d 655 (1989).
But different interests are in play when a scheme of compulsory insurance is intended to protect innocent members of the public, such as in our compulsory insurance laws for automobiles, limited liability partnerships, and the practice of medicine. In such cases, our jurisprudence draws a distinction between the party who procures an insurance policy through misrepresentations and the innocent party who plays no role in a fraud on the insurer and is a victim falling within the coverage protections of the insurance policy. LaCroix, supra, 194 N.J. at 530-32, 946 A.2d 1027; see also Fisher v. N.J. Auto. Full Ins. Underwriting Ass’n, 224 N.J.Super. 552, 557, 540 A.2d 1344 (App.Div.1988) (“The insurance carrier’s liability to its [injsured who may be guilty of some act or conduct which renders a policy void ab initio is therefore distinct from its liability to an injured third person.”). Thus, “an insurer cannot, on the ground of fraud or misrepresentations relating to the inception of the policy, retrospectively avoid coverage under a compulsory or financial responsibility insurance law so as to escape liability to a third party.” Fisher, supra, 224 N.J.Super. at 558, 540 A.2d 1344 (quoting 7 Am.Jur.2d Automobile Insurance § 37 (1980)); see also Palisades Safety & Ins. Ass’n v. Bastien, 175 N.J. 144, 149, 814 A.2d 619 (2003) (noting that insurance company cannot “escape[ ] liability in respect of innocent, third-party members of the public whose protection is a paramount *389 concern”). An example of those equitable principles is found in our automobile insurance law.
In New Jersey, all motor vehicle owners must maintain liability insurance coverage. N.J.S.A. 39:6B-l(a). Moreover, “once its insured has become responsible for damages to third-party judgment creditors, an insurer is precluded from retroactively ‘cancel-ling’ or ‘annulling’ an automobile liability policy based upon prior misrepresentations or fraud of its insured.” N.J. Mfrs. Ins. Co. v. Varjabedian, 391 N.J.Super. 253, 256, 917 A.2d 839 (App.Div.) (quoting N.J.S.A. 39:6-48(a)), certif. denied, 192 N.J. 295, 927 A.2d 1294 (2007). The principle that an insurance company cannot void a policy to the detriment of an innocent third party has been upheld in cases involving compulsory insurance laws intended for the protection of the public.
In LaCroix, supra, we determined that the insured’s eighteen-year-old daughter could not be barred from receiving “personal-injury-proteetion (PIP) benefits under her father’s automobile insurance policy because, unbeknownst to her, her father had not identified her as a household resident in his insurance application.” 194 N.J. at 518-19, 946 A.2d 1027. The father was required to purchase PIP coverage under N.J.S.A. 39:6A-4.3. LaCroix, supra, 194 N.J. at 532, 946 A.2d 1027. We held that “the equitable remedy of rescission properly was molded to require payment of the statutorily required minimum level of PIP benefits to” the daughter who suffered injuries in an automobile accident. Id. at 519, 946 A.2d 1027. We did so because the daughter was “innocent of the deceit perpetrated by her father” and because “we have never turned a deaf ear to the equities when plainly innocent parties cry out for relief.” Id. at 530-31, 946 A.2d 1027.
C.
No controlling precedent supports the position the majority takes today, reversing both the trial court and the Appellate Division and leaving the innocent patient remediless. The majority reaches the inequitable, not the inevitable, outcome.
*390 First, the comparison of physicians and podiatrists to lawyers in general is not apt because lawyers are not presently subject to a comprehensive legislative or judicial scheme mandating the purchase of malpractice insurance. Lawyers are required to purchase malpractice insurance only if they organize as professional corporations or limited liability partnerships. R. 1:21-1A(a)(3), - 1B(a)(4), -1C(a)(3).
Second, none of the legal-malpractice cases cited by the majority bear any resemblance to the facts before us. Liberty Surplus Insurance Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 439-41, 916 A.2d 440 (2007), merely stands for the proposition that a law firm forfeited coverage in a malpractice ease under a claims-made policy by misrepresenting in the insurance application that it was unaware of a potential claim at the time the application was completed. Liberty Surplus deals with the denial of a claim, not the rescission of an insurance policy. Ibid.
In Liebling v. Garden State Indemnity, 337 N.J.Super. 447, 450-51, 767 A.2d 515 (App.Div.), certif. denied 169 N.J. 606, 782 A.2d 424 (2001), an attorney did not disclose in an application for a claims-made malpractice insurance policy that a potential malpractice lawsuit was looming. The attorney knew that he would likely be sued for failing to file a civil action within the statute of limitations. Id. at 464-65, 767 A.2d 515. The Appellate Division concluded that the attorney “could not have honestly believed that he was secure from a claim, and, therefore, [the insurance carrier] was justified in denying coverage.” Liberty Surplus, supra, 189 N.J. at 449, 916 A.2d 440 (citing Liebling, supra, 337 N.J.Super. at 464-65, 767 A.2d 515).
Last, First American Title Insurance Co. v. Lawson, 177 N.J. 125, 827 A.2d 230 (2003), engaged in a finely nuaneed balancing of equities in reviewing whether an insurance carrier was required to provide coverage to three attorneys of a law firm organized as a limited liability partnership. Two of the attorneys, one of whom was unauthorized to practice law in New Jersey, were engaged in a “ ‘kiting’ scheme whereby monies from one client trust account *391 would be transferred to pay the obligations of another client.” Id. at 130, 827 A.2d 230 (quoting First Am. Title Ins. Co. v. Lawson, 351 N.J.Super. 407, 414, 798 A.2d 661 (App.Div.2002)). This Court affirmed the forfeiture of coverage for those two malefactors, one of whom applied for the firm’s claims-made professional liability insurance policy with full knowledge of their wrongdoing, id. at 129, 827 A.2d 230 — wrongdoing that violated the Rules of Professional Conduct.[1]
However, the Court took a different approach with respect to the innocent law partner. We held that the innocent attorney could not be stripped of insurance coverage because, unbeknownst to him, the managing partner and another partner committed fraudulent acts and secured malpractice insurance through misrepresentations. Id. at 129-31, 827 A.2d 230. We noted that our Rule of Court requiring a limited liability partnership to maintain professional liability insurance, R. 1:21-1C(a)(3), “helps to limit the public’s exposure to uninsured risks arising from the receipt of legal services in this State.” Lawson, supra, 177 N.J. at 139, 827 A.2d 230. We explained that the innocent partner “had every reason to expect that his exposure to liability would be circumscribed in accordance with the Uniform Partnership Law,” which “shield[s] partners from incurring liability arising solely from the wrongful acts of fellow partners.” Id. at 136, 142, 827 A.2d 230. Additionally, we noted that denying coverage to the innocent law partner “could leave members of the public, whom [the innocent partner] had represented throughout that period, unprotected even though the insured himself committed no fraud.” Id. at 143, 827 A.2d 230.
Thus, in Lawson, this Court protected the innocent attorney from a backdated rescission of an insurance policy because he was unaware of his partner’s misrepresentations in securing the insurance coverage. Lawson is a study in how to balance equities. It *392 is not a mandate to deny insurance coverage to the innocent patient who suffered medical malpractice in this case.
III.
Here, in viewing the totality of the circumstances, equity weighs in favor of upholding the RIJUA’s obligation to cover the claim of DeMarco and his wife. The omitted information in Dr. Stoddard’s application and reapplication pertained only to the geography of his practice, not to his ability to perform his professional duties. The issue is not whether the RIJUA has a right to rescind Dr. Stoddard’s insurance, but whether it has the right to backdate the rescission at the expense of the innocent patient.
In balancing the equities, we should place great emphasis on the fact that the RIJUA was in the best position to uncover any inaccuracies in Dr. Stoddard’s insurance applications. By September 2010, when the alleged malpractice occurred, Dr. Stoddard’s practice in New Jersey was open and notorious. In his insurance renewal application filed earlier that year, Dr. Stoddard listed an address in Lakewood, New Jersey as the location of his podiatry practice.
Had the RIJUA exercised even a minimal degree of due diligence, it would have discovered that Dr. Stoddard’s practice was not primarily located in Rhode Island. Only when the RIJUA had to pay out on a potential claim — not when it was accepting premiums — did it make a reasonable inquiry. Other jurisdictions, as a matter of sound public policy, require an insurance company to exercise due care in reviewing an insurance application at the time it is submitted. See, e.g., Olivio v. Gov’t Emps. Ins. Co. of Washington D.C., 46 A.D.2d 437, 362 N.Y.S.2d 873, 880 (1975) (requiring insurer to pay third-party victim full policy amount — as opposed to minimum compulsory amount — when insurer negligently delayed investigation of fraudulent application until after suit was filed); State Farm Mut. Auto. Ins. Co. v. Wood, 25 Utah 2d 427, 483 P.2d 892, 893 (1971) (“An insurer cannot neglect its duty to make a reasonable investigation of insurability or postpone *393 that investigation until after it learns of a probable claim and still retain its [premiums.]”). Dr. Stoddard’s renewal application contained the location and telephone number of his New Jersey practice. That was a sufficient red flag to prompt an inquiry by the RIJUA if it did not want to continue collecting Dr. Stoddard’s premiums.
Like the innocent parties in LaCroix and Lawson, DeMarco was entirely unaware of any misrepresentation made by Dr. Stoddard to the RIJUA and had no ability to. discover it. Instead, the patient had the reasonable expectation that his podiatrist was in compliance with the statutory requirement to maintain medical malpractice insurance. He also had the right to rely on the fact that, at the time of his surgery, the RIJUA was Dr. Stoddard’s malpractice carrier.
To require the DeMarcos to bear the entire cost of damages resulting from Dr. Stoddard’s alleged malpractice is inconsistent with principles of equity. The RIJUA in this ease has reaped a windfall — it pocketed three years of premiums, backdated a rescission, and is not required to expend a single dollar of collected premiums to compensate the innocent patient and his wife victimized by Dr. Stoddard’s alleged medical malpractice. That is hardly an equitable result, nor is it in keeping with New Jersey’s public policy.
That public policy is clearly expressed in our law that mandates insurance coverage for innocent victims of medical malpractice, in circumstances such as we have here. The RIJUA should be required to pay up to the minimum amount of insurance that a patient expects a doctor to maintain — the $500,000 necessary for a letter of credit.
In reversing the trial court and Appellate Division, the majority has decided on an approach that leaves an innocent patient without a source of compensation for damages suffered by the malpractice of his insolvent doctor.
*394 Because that approach is contrary to public policy, I respectfully dissent.
For reversal — Justices LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON and Judge CUFF (temporarily assigned) — 5.
For dissent — Chief Justice RABNER and Justice ALBIN — 2.

 Victims of such illegal schemes are financially protected up to an amount fixed by the New Jersey Lawyers' Fund for Client Protection. R. 1:28.