SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Thomas DeMarco v. Sean Robert Stoddard, D.P.M.** (A-104-13) (073949)

**Argued April 27, 2015 -- Decided December 1, 2015**

**CUFF, P.J.A.D. (temporarily assigned), writing for a majority of the Court.**

In this appeal, the Court considers whether the Rhode Island Medical Malpractice Joint Underwriting Association (RIJUA) must defend and indemnify a podiatrist in a medical malpractice action pending in New Jersey following rescission of the podiatrist's malpractice liability policy.

Defendant Sean Robert Stoddard, D.P.M. practiced podiatry at a clinic with offices in Toms River and Lakewood. In 2007, he applied to the RIJUA for medical malpractice liability insurance. Among other representations, the application indicated that at least fifty-one percent of Dr. Stoddard's practice was generated in Rhode Island; that answer was false. Dr. Stoddard submitted renewal applications from 2008 through 2011, each of which stated that at least fifty-one percent of Dr. Stoddard's practice was generated in Rhode Island.

Dr. Stoddard performed three surgeries on plaintiff Thomas DeMarco, a New Jersey resident. The third surgery occurred in September 2010. In October 2011, DeMarco and his wife filed a medical malpractice complaint in New Jersey alleging that Dr. Stoddard negligently performed the September 2010 surgery. Dr. Stoddard forwarded the complaint to the RIJUA, which responded with a reservation of rights letter stating that the RIJUA only provides coverage for physicians who maintain fifty-one percent of their "professional time and efforts" in Rhode Island, and that the RIJUA was "in the process of securing facts concerning whether [Dr. Stoddard] . . . met the fifty-one percent (51%) requirement for the provision of insurance coverage from the [RI]JUA."

In January 2012, the RIJUA filed declaratory judgment action in Rhode Island, naming both Dr. Stoddard and the DeMarcos as defendants. The RIJUA sought a declaration that Dr. Stoddard misrepresented material information in his insurance applications and a judgment permitting rescission of the policy. In March 2012, the DeMarcos named the RIJUA as a defendant in their medical malpractice action, and sought a declaratory judgment that the RIJUA was required to defend Dr. Stoddard and indemnify him up to $1 million. In May 2012, the Rhode Island court entered a default judgment against Dr. Stoddard, declaring his 2010-2011 renewal policy void and holding that the RIJUA had no duty to defend or indemnify him for the DeMarcos' claims. Thereafter, the RIJUA and the DeMarcos filed cross-motions for summary judgment in the New Jersey malpractice case. The court determined that New Jersey law should apply, and held that the Rhode Island judgment could not be enforced in the New Jersey action because it was entered without jurisdiction over the DeMarcos. The trial court went on to grant the DeMarcos' motion for summary judgment and deny the RIJUA's motion.

The Appellate Division granted the RIJUA's motion for leave to appeal, and affirmed the trial court order in a published opinion. 434 N.J. Super. 352 (App. Div. 2014). The panel determined that New Jersey law should apply and concluded that innocent third parties should be protected for a claim arising before rescission. Id. at 380. Comparing medical malpractice liability insurance to the protection afforded to innocent third parties when a motor vehicle liability insurance policy has been rescinded, the panel concluded that the RIJUA owed a duty to indemnify Dr. Stoddard up to $1 million -- the amount of medical malpractice liability insurance that a physician licensed to practice medicine and performing medical services in this State is required to maintain.

The Court granted RIJUA's motion for leave to appeal. 218 N.J. 270 (2014).

**HELD**: The RIJUA owed neither a duty to defend nor a duty to indemnify its insured, who had misrepresented the proportion of his practice generated in Rhode Island, which was a fact that formed the basis for his eligibility for insurance through the RIJUA.

1. In New Jersey, malpractice insurance is mandatory for physicians and podiatrists. The mandated minimum amount of coverage is $1 million per occurrence and $3 million per policy year. There is scant case law interpreting the statutes and regulations requiring medical malpractice liability insurance. However, in Jarrell v. Kaul, ___ N.J. ___, ___ (2015) (slip op. at 2), the Court reviewed the medical malpractice liability insurance scheme in the context of a complaint against a physician who did not have the statutorily mandated coverage. There, only one issue implicated the consequences to a patient with a pending negligence claim when a policy is rescinded. The Court opined that the statute requiring a physician to obtain and maintain medical malpractice liability insurance does not give rise to a direct cause of action by an injured patient to enforce that requirement. (pp. 14-16)

2. In the context of compulsory legal malpractice insurance, there is a well-developed body of law holding that a malpractice insurance policy may be declared void from its inception due to a misrepresentation of material fact in an application for insurance. Upon rescission, the insurer owes no duty to defend or indemnify a firm or defalcating attorney for any complaints pending or claims that accrued at the time of rescission. An attorney will not have access to insurance coverage to respond to claims from injured third parties, clients, or title companies, if the policy has been rescinded due to the attorney's misrepresentations of material fact in the policy application. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 446-49 (2007); First American Title Insurance Co. v. Lawson, 177 N.J. 125, 192 (2003). The Court discerns no basis to treat other professionals required to maintain professional liability insurance, including physicians and podiatrists, in a different manner. All professional liability insurance serves the same purpose -- to defend when claims are filed against a professional and to serve as a source of funds to compensate injured patients or clients. Reformation of a medical malpractice liability policy to conform to statutorily mandated minimum amounts suggests that fraudulent conduct is condoned, and runs counter to Jarrell, where the Court denied a direct action for compensation by a patient against an uninsured physician. (pp. 16-20)

3. In reaching this determination, the Court concludes that the compulsory automobile insurance model has no relevance to the remedial response to a fraudulently obtained policy of professional liability insurance and the effect of rescission on innocent third parties. In contrast to the web of interrelated provisions attending the no-fault automobile liability model, the Legislature has not constructed a matrix of alternate remedies for other types of liability insurance, including compulsory professional liability insurance. Nor has the Legislature created an expectation that insurance coverage will be available to redress an injury even in the face of a fraudulently obtained policy. Furthermore, the vast differences in the amount of liability insurance that a driver and a physician must carry, and the fact that some physicians procure professional liability insurance through a joint underwriting association, counsel against utilizing the compulsory automobile liability insurance model to devise a remedy for an injured patient whose physician is uninsured by virtue of a rescission. The Court, thus, concludes that the Appellate Division's reliance on the compulsory automobile liability insurance model was misplaced. (pp. 20-24)

4. Finally, the Court addresses the panel's determination that a conflict of laws arose from the difference in the manner in which New Jersey and Rhode Island address compulsory medical malpractice insurance. The Court finds that on the critical inquiry in this appeal -- whether a rescinded policy of medical malpractice liability insurance provides any coverage to the insured for claims that arose prior to rescission -- both New Jersey and Rhode Island courts would rescind a policy ab initio, in which case the insured is without insurance coverage to respond to a claim by a third party. To the extent that each state requires a podiatrist to maintain medical malpractice liability insurance, the Court discerns no difference in the laws that amounts to a conflict of laws. (pp. 24-27)

The judgment of the Appellate Division is **REVERSED**.

**ALBIN, J.**, **DISSENTING**, joined by **CHIEF JUSTICE RABNER**, agrees with the majority's conclusion that New Jersey law applies to the DeMarsos' lawsuit, but disagrees that under this State's law, the medical-malpractice carrier can retroactively cancel insurance to deny an innocent patient coverage for a physician's professional negligence. Justice Albin expresses the view that New Jersey's compulsory medical malpractice insurance law exists to ensure that patients can secure financial compensation in the event of a doctor's professional negligence. He would require the insurer to provide coverage up to $500,000 to DeMarco and his wife.

**JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.**

THOMAS DEMARCO and CYNTHIA
DEMARCO,

     Plaintiffs-Respondents,

          v.

SEAN ROBERT STODDARD, D.P.M.,
Individually and t/a CENTER
FOR ADVANCED FOOT & ANKLE
CARE, INC.,

     Defendant,

          and

MEDICAL MALPRACTICE JOINT
UNDERWRITING ASSOCIATION OF
RHODE ISLAND,

     Defendant-Appellant.


          Argued April 27, 2015 – Decided December 1, 2015

          On appeal from the Superior Court, Appellate
          Division, whose opinion is reported at 434
          N.J. Super. 352 (App. Div. 2014).

          Todd J. Leon argued the cause for appellant
          (Hill Wallack, attorneys; Mr. Leon and
          Gerard H. Hanson, on the briefs).

          Michael D. Schottland argued the cause for
          respondents (Lomurro, Davison, Eastman &
          Munoz, attorneys; Mr. Schottland, Christina
          Vassiliou Harvey, and Michael J. Fasano, on
          the briefs).

          Hugh P. Francis argued the cause for amici
          curiae (Francis & Berry, attorneys for
          Property Casualty Insurers Association of

America and Insurance Council of New Jersey; Brown Moskowitz & Kallen, attorneys for New Jersey Civil Justice Institute; Fox Rothschild, attorneys for New Jersey Physicians United Reciprocal Exchange; Mr. Francis, Joanna Huc, Shalom D. Stone, Jeffrey M. Pollock and Abbey True Harris, on the briefs).

E. Drew Britcher argued the cause for amicus curiae New Jersey Association for Justice (Britcher, Leone & Roth, attorneys; Mr. Britcher and Jessica E. Choper, on the brief).

JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

In this appeal, we consider whether the Rhode Island Medical Malpractice Joint Underwriting Association (RIJUA) must defend and indemnify a podiatrist in a medical malpractice action pending in New Jersey following rescission of the podiatrist's medical malpractice liability policy. The policy had been rescinded due to material misrepresentations concerning the state in which the insured podiatrist maintained his primary practice. The trial court and the Appellate Division, applying New Jersey law, held that in a medical malpractice action pending in this State, the insurer had the duty to defend and indemnify the insured podiatrist up to $1 million, the amount of professional liability insurance physicians and podiatrists are required to maintain in this State.

2

We granted leave to appeal, and now reverse. The critical inquiry in this case is whether a rescinded policy of medical malpractice liability insurance provides any coverage to the insured for claims that arose prior to rescission. Although the Appellate Division correctly determined that New Jersey law applies, we conclude that the Appellate Division erred when it referred to the compulsory automobile liability model as the guidepost for fashioning a remedy for third-party claimants whose claims arose prior to rescission. The appellate panel further erred by reforming the rescinded policy to require the insurer to defend and indemnify its insured up to the mandatory minimum amount of coverage required in this State.

We conclude that resolution of the question of what, if any, coverage is available to an insured to respond to third-party claims following rescission of a policy is governed by the rule announced in First American Title Insurance Co. v. Lawson, 177 N.J. 125 (2003), and its progeny. Applying that rule, the RIJUA owed neither a duty to defend nor a duty to indemnify its insured, who had misrepresented the proportion of his practice generated in Rhode Island, which was a fact that formed the basis for his eligibility for insurance through the RIJUA. We therefore reverse the judgment of the Appellate Division.

I.

3

Plaintiff Thomas DeMarco, a New Jersey resident, sought treatment for chronic plantar fasciitis from defendant Sean Robert Stoddard, D.P.M. Dr. Stoddard practiced podiatry at the Center for Advanced Foot & Ankle Care, Inc., which had offices in Toms River and Lakewood. Dr. Stoddard diagnosed DeMarco with a split peroneal tendon and performed three surgical procedures on DeMarco between 2004 and January 2011. The third surgery, which forms the basis of DeMarco's complaint, occurred in September 2010.

In 2007, Dr. Stoddard applied to the RIJUA for medical malpractice liability insurance. He submitted his application through Linda O'Neill, an agent located in Rhode Island. The application listed Dr. Stoddard's office at a Rhode Island address, but the office phone number had a New Jersey area code. The application also provided that Dr. Stoddard was "currently applying" for affiliation with a Rhode Island hospital. The "Licensure" section of the application asked whether at least fifty-one percent of the applicant's practice was generated in Rhode Island. The application had "Yes" checked off, but that answer was false. The application then stated, partly in bold letters: **"IF YOUR ANSWER IS NO, DO NOT CONTINUE.** You are not eligible for coverage under the Rhode Island MMJUA." The agent claims that Dr. Stoddard provided all of the information required in his initial application.

4

Through the same Rhode Island agent, Dr. Stoddard submitted renewal applications each year from 2008 through 2011. Each of the renewal forms stated that at least fifty-one percent of Dr. Stoddard's practice was generated in Rhode Island. In addition, the renewal application for the 2010-2011 coverage year -- when Dr. Stoddard performed the surgery that forms the basis of DeMarco's malpractice claim -- listed an office address in Lakewood.

In January 2011, Dr. Stoddard told DeMarco that he was moving to California. DeMarco's condition worsened, and he sought treatment from an orthopedic surgeon. The surgeon performed two additional surgeries on DeMarco.

In October 2011, DeMarco and his wife, Cynthia DeMarco (the DeMarcos) filed a medical malpractice complaint in New Jersey against Dr. Stoddard and the Center for Advanced Foot & Ankle Care, Inc., alleging that Dr. Stoddard negligently performed the September 2010 surgery. Dr. Stoddard forwarded the DeMarcos' complaint to the RIJUA, which responded with a reservation of rights letter. The letter indicated that the RIJUA only provides coverage for physicians who maintain fifty-one percent of their "professional time and efforts" in Rhode Island and that the RIJUA was "in the process of securing facts concerning whether [Dr. Stoddard] . . . met the fifty-one percent (51%)

requirement for the provision of insurance coverage from the [RI]JUA."

Less than a week later, Dr. Stoddard wrote a letter to the attorney representing the DeMarcos, advising that he "has no malpractice coverage in regards to [their] claim." Dr. Stoddard also stated that he tried to build his practice in Rhode Island but failed and that an agent told him he could enroll with the RIJUA even though the bulk of his practice was in New Jersey. Additionally, Dr. Stoddard stated that he had no assets, his new practice -- a professional corporation in California -- was struggling, he was in the midst of a divorce, he had defaulted on his student loans, and he had "a significant amount of debt." Dr. Stoddard conceded that he could not prove that he satisfied the RIJUA's fifty-one percent requirement, and stated that "it would be a waste of time to pursue this claim against me based on these facts."

## II.

In January 2012, the RIJUA filed a complaint for a declaratory judgment in Rhode Island, naming both Dr. Stoddard and the DeMarcos as defendants. The RIJUA sought a judgment declaring that Dr. Stoddard misrepresented material information in his four applications to the RIJUA. It also sought a judgment permitting rescission of the policy. In February 2012, the DeMarcos' attorney sent a letter to the RIJUA's general

6

counsel, indicating that he did not believe his clients were subject to personal jurisdiction in Rhode Island.

In March 2012, the DeMarcos amended their medical malpractice complaint. They added the RIJUA as a defendant and sought a declaratory judgment that the RIJUA was required to defend Dr. Stoddard and indemnify him up to $1 million in the event that the DeMarcos were awarded damages for their claims against Dr. Stoddard.

In May 2012, the Rhode Island court entered a default judgment against Dr. Stoddard, declaring his renewal policy from 2010 to 2011 void and holding that the RIJUA had no duty to defend or indemnify Dr. Stoddard for the DeMarcos' claims.

Thereafter, the RIJUA and the DeMarcos filed cross-motions for summary judgment in the New Jersey malpractice case. The motions addressed whether the RIJUA was required to defend and indemnify Dr. Stoddard and the effect of the default judgment in Rhode Island against Dr. Stoddard. The trial court applied a choice of law analysis and determined that New Jersey law should apply. The court held that the Rhode Island judgment was not entitled to full faith and credit and could not be enforced in the New Jersey action because it was entered without jurisdiction over the DeMarcos. Finally, the trial court denied the RIJUA's motion for summary judgment and granted the DeMarcos' motion, concluding that the DeMarcos were entitled to

summary judgment "because compulsory insurance cannot be voided as to an innocent third party." The court also awarded the DeMarcos attorneys' fees for successfully litigating the RIJUA's disclaimer of coverage.

The Appellate Division granted the RIJUA's motion for leave to appeal. In a published opinion, DeMarco v. Stoddard, 434 N.J. Super. 352 (App. Div. 2014), the Appellate Division affirmed the trial court order.

The Appellate Division determined that "[t]he precise question before us is whether a medical malpractice insurance carrier may rescind a policy so that the carrier has no duty to indemnify the insured doctor for injuries suffered by an innocent third party who made a malpractice claim before the policy was rescinded." Id. at 367. The panel predicted that this State would permit rescission of a compulsory medical malpractice liability insurance policy due to misrepresentations of material facts in the policy application but would protect an innocent third party, such as a patient whose claim arose prior to rescission, up to the minimum amount of required coverage. Ibid. The panel also determined that Rhode Island might protect innocent third parties. Ibid.

In addition, the panel concluded that "[a]nalogous case law of both states suggests that both would restrict the rescission remedy . . . in order to provide some protection to innocent

third parties for whose benefit compulsory insurance laws were enacted." Ibid. In reaching this conclusion, the panel compared medical malpractice liability insurance to the protection afforded to innocent third parties when a motor vehicle liability insurance policy has been rescinded. Id. at 368-73. The Appellate Division determined, however, that Rhode Island had "not directly compelled coverage in any specific amount," while New Jersey requires $1 million of coverage, necessitating a choice-of-law analysis. Id. at 373-74. The Appellate Division determined that New Jersey law should apply and concluded that innocent third parties should be protected for a claim arising before rescission. Id. at 380. Applying that rule to plaintiffs, the panel concluded that the RIJUA owed a duty to indemnify Dr. Stoddard up to $1 million, the amount of medical malpractice liability insurance that a physician licensed to practice medicine and performing medical services in this State is required to maintain, even though the record demonstrated that Dr. Stoddard provided materially false information to the RIJUA in his applications for insurance coverage. Ibid.

We granted the RIJUA's motion for leave to appeal. 218 N.J. 270 (2014). We also granted motions to appear as amicus curiae by five entities: New Jersey Civil Justice Institute (NJCJI), New Jersey Physicians United Reciprocal Exchange

9

(NJPURE), Property Casualty Insurers Association of America (Property Casualty Insurers), Insurance Council of New Jersey (Insurance Council), and New Jersey Association for Justice (NJAJ).

III.

A.

The RIJUA raises three points of error in the Appellate Division's decision. First, it argues that Rhode Island law should apply to the coverage dispute. Although the RIJUA agrees that Rhode Island and New Jersey law conflict, it disputes that a conflict of law analysis results in the application of New Jersey law. In particular, the RIJUA argues that the Appellate Division erroneously viewed the coverage dispute as a first-party claim by the DeMarcos against the RIJUA. Instead, the RIJUA submits that the dispute consisted of a third-party claim by the DeMarcos, which addressed whether the RIJUA must defend and indemnify Dr. Stoddard in response to their claims. Accordingly, the RIJUA maintains that the Appellate Division focused on the DeMarcos' interests when it should have focused on the interests of the parties to the insurance contract -- the RIJUA and Dr. Stoddard. The RIJUA thus argues that consideration of those interests would have led to the proper conclusion that Rhode Island law applies.

10

Second, the RIJUA argues that the reformation remedy fashioned by the Appellate Division was inequitable under New Jersey law.  Citing the dissent in Citizens United Reciprocal Exchange v. Perez (CURE), 432 N.J. Super. 526, 538 (App. Div. 2013), rev'd, 223 N.J. 143 (2015), the RIJUA asserts that while courts must protect innocent third parties, they must also provide some relief to the defrauded insurance provider.  Under the Appellate Division judgment, even though the policy is void due to Dr. Stoddard's misrepresentations, the RIJUA is made liable for the same amount of coverage -- $1 million -- as it would if the policy was valid.  In other words, the RIJUA argues that the Appellate Division's decision is inequitable because it failed to provide any relief whatsoever to the RIJUA.  It also states that such a result fails to provide any disincentive for an applicant to lie to an insurance provider.

The RIJUA also contends that "mandatory [professional] malpractice coverage can and will be voided, in full and ab initio, as a result of fraud in the application by an insured."  In particular, the RIJUA relies on Lawson, supra, 177 N.J. 125.

Last, the RIJUA argues that attorneys' fees were improperly awarded to the DeMarcos under Rule 4:42-9(a) because its position was not a "groundless disclaimer" of coverage.

B.

11

The DeMarcos argue that this case does not present a significant conflict of law issue because both New Jersey and Rhode Island have laws requiring compulsory medical malpractice insurance and both states protect innocent third parties seeking to recover under a statutorily mandated insurance policy. Nevertheless, the DeMarcos assert that the Appellate Division resolved the conflict of law question correctly by ruling that New Jersey law applied.

Additionally, the DeMarcos assert that the Appellate Division decision was fair and equitable. Plaintiffs contend that the RIJUA was in a better position to detect Dr. Stoddard's misrepresentations and reject his renewal applications. Accordingly, they contend it would not be equitable to force the DeMarcos to bear the loss.

The DeMarcos also assert that the Appellate Division's determination is consistent with New Jersey law. They contend that it is universally recognized that an insurer cannot escape liability to a third party even if the insured procured coverage through fraud or misrepresentation. The DeMarcos distinguish Lawson on the grounds that the insured party here is a private citizen, as opposed to an insurance company. Moreover, the misrepresentation in Lawson related to a presently existing claim against the law firm, whereas the misrepresentation in this case related to the likelihood of potential future claims

12

arising outside of Rhode Island.  They assert that the RIJUA knew that Dr. Stoddard could potentially face a claim outside of Rhode Island, as the policy only required fifty-one percent of the practice to be in Rhode Island.  Therefore, the RIJUA knowingly assumed the risk that it might become involved in litigation in New Jersey.  In contrast, the DeMarcos contend that the misrepresentation in Lawson induced an agreement by concealing a risk unknown to the insurer.

Finally, the DeMarcos assert that the trial court properly awarded attorneys' fees.

C.

Amici NJCJI, NJPURE, Property Casualty Insurers, and Insurance Council urge reversal of the Appellate Division judgment.  Each argues that the appellate panel misperceived the breadth of the rule protecting innocent third parties following rescission of an insurance policy.  Each notes that compulsory automobile insurance policies occupy a unique place in the law of this State, and each emphasizes that well-established authority addressing compulsory professional liability insurance coverage permits rescission of a fraudulently induced policy with no protection to innocent third parties, such as clients or patients.

Amicus NJPURE also asserts that the appellate panel opinion "incentivizes applicants to commit fraud."  Amici Property

Casualty Insurers and Insurance Council urge that the rule announced by the Appellate Division will hinder proper underwriting and diminish the availability of professional liability insurance coverage.

Amicus NJAJ urges affirmance of the Appellate Division judgment. It contends that the opinion upholds the public policy of this State to protect the rights of innocent third parties when an insurer seeks to void ab initio a policy of insurance.

IV.

A.

In New Jersey, the Legislature first instituted mandatory malpractice insurance for physicians and podiatrists in 1998. L. 1997, c. 365, § 1 (physicians); L. 1997, c. 365, § 2 (podiatrists). N.J.S.A. 45:5-5.3, which codified L. 1997, c. 365, § 2, mandates that podiatrists must obtain and maintain malpractice liability insurance, or if coverage is unavailable, a letter of credit for at least the minimum amount prescribed by the Board of Medical Examiners (BME).[1] The BME promulgated a regulation setting the minimum amount of malpractice insurance for physicians and podiatrists at $1 million per occurrence and $3 million per policy year. N.J.A.C. 13:35-6.18.

_____

[1] The minimum amount required for the letter of credit is $500,000. N.J.A.C. 13:35-6.18(b).

14

In 2004, the Legislature amended L. 1997, c. 365, § 1.

N.J.S.A. 45:9-19.17; L. 2004, c. 17, § 25.  The 2004 amendment

codified the 1999 regulation and set the minimum amount of

malpractice insurance for physicians at $1 million per

occurrence and $3 million per policy year.  L. 2004, c. 17, §

25.  Notably, the 2004 statutory amendment addressed only

physicians.  Nevertheless, the 1999 regulation applies to both

physicians and podiatrists, and sets the floor for both at $1

million per occurrence and $3 million per policy year.  N.J.A.C.

13:35-6.18.  In addition, N.J.S.A. 45:9-19.17 requires

physicians to maintain an insurance policy specifically "by a

carrier authorized to write medical malpractice liability

insurance policies in this State," but N.J.S.A. 45:5-5.3 does

not include a similar requirement for podiatrists.

There is scant case law interpreting the statutes and

regulations requiring physicians and podiatrists to obtain and

maintain medical malpractice liability insurance.  In Jarrell v.

Kaul, ___ N.J. ___, ___ (2015) (slip op. at 2), the Court

reviewed the compulsory medical malpractice liability insurance

scheme adopted by the Legislature in the context of a multi-

count complaint filed by a patient injured by a physician who

did not have the statutorily mandated medical malpractice

liability coverage.  Only one of the issues before the Court in

Jarrell implicated the consequences to a patient with a pending

15

negligence claim when a policy is rescinded. Ibid. The Court opined that the statute requiring a physician practicing medicine in this State to obtain and maintain medical malpractice liability insurance does not give rise to a direct cause of action by an injured patient to enforce that requirement. Id. at ___ (slip op. at 21). The only other case addressing the consequences to an injured third party due to the absence of medical malpractice liability insurance is the opinion under review.

In the context of compulsory legal malpractice insurance,[2] however, there is a well-developed body of law holding that a legal malpractice insurance policy may be declared void from its inception due to a misrepresentation of material fact by the insured in an application for insurance. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 446-49 (2007); Lawson, supra, 177 N.J. at 129. Upon rescission, the insurer owes no duty to defend or indemnify the law firm or any

---

[2] In 1997, the Court adopted rules that require firms organized to practice law as professional corporations pursuant to The Professional Service Corporation Act, N.J.S.A. 14A:17-1 to -18, as limited liability companies pursuant to the New Jersey Limited Liability Company Act, N.J.S.A. 14A:2B-1 to -70 (now repealed), or as limited liability partnerships pursuant to the Uniform Partnership Act, N.J.S.A. 42:1A-1 to -56, to obtain and maintain professional liability insurance. R. 1:21-1A(a)(3), -1B(a)(4), and -1C(a)(3). Rhode Island has a similar requirement, although the minimum mandatory amount of coverage is different from that in New Jersey. R.I. Gen. Laws § 7-5.1-8.

16

defalcating attorney of the firm for any complaints pending or claims that accrued at the time of rescission. Lawson, supra, 177 N.J. at 129.

In Lawson, one of three members of a law firm applied for professional liability insurance for the firm and its members. Id. at 131. At the time, the member had been engaged in a scheme in which he improperly transferred funds between client accounts and the firm business account to meet the firm's financial obligations. Id. at 130-31. A second member of the firm had previously discovered the scheme but took no action to cease the practice. Ibid. In the insurance application, the member who initiated the scheme falsely stated that he knew of no "acts, errors or omissions in professional services that may reasonably be expected to be the basis of a professional liability claim," and warranted that all information in the application was accurate. Id. at 131. At about the same time, the Office of Attorney Ethics (OAE), acting on three grievances filed against the firm, notified the firm that it would conduct an audit. Id. at 132. The attorney who had filed the original application later provided a new warranty as to the accuracy of the information in the application. Ibid.[3]

---

[3] Soon thereafter, the OAE sought and obtained the temporary suspension of the member who had discovered but did not curtail the scheme. Id. at 132.

17

As a result of numerous improper transfers, title insurers that paid claims to various individuals represented by the firm sought recovery against the firm and its members, who in turn sought coverage from their professional liability insurer. Id. at 132-33. The insurer obtained a declaratory judgment allowing it to rescind coverage in respect to the two defalcating members but not the third member or the firm. Id. at 134. In reviewing this judgment,[4] this Court held that the insurer had "the clear right to rescind [a defalcating attorney's] coverage in the face of his blatant and direct misrepresentations." Id. at 140. The Court expressly rejected the contention of the title insurers -- injured third parties -- that the remedy for such misrepresentations should only be prospective rescission of the policy. Ibid. In doing so, the Court recognized that two of the firm's three attorneys would be without insurance coverage to respond to malpractice claims filed against them by injured clients and the title insurer. Id. at 143. The Court reasoned that the harsh result was warranted because "[p]ermitting the . . . coverage to survive [the member's] defalcations would, in essence, condone . . . fraudulent conduct." Id. at 141.

Later, in Liberty Surplus Insurance, supra, this Court upheld the entry of summary judgment in favor of the insurer in

---

[4] On appeal, the Appellate Division held that the coverage was void as to all three members and the firm. Id. at 134.

18

a declaratory judgment action seeking rescission ab initio of a legal malpractice liability insurance policy due to misrepresentations of material fact in the policy application. 189 N.J. at 450. The firm therefore faced the legal malpractice claim filed by the injured client without coverage. Ibid.; see also Liebling v. Garden State Indem., 337 N.J. Super. 447, 450-51 (App. Div.) (affirming summary judgment rescinding legal malpractice policy and denying coverage for professional negligence action filed and served on firm before application for and issuance of policy), certif. denied, 169 N.J. 606 (2001).

Thus, it is well established in this State that an attorney will not have access to insurance coverage to respond to claims from injured third parties, clients, or title companies, if the professional liability insurance policy has been rescinded due to the attorney's misrepresentations of material fact in the policy application. We discern no basis to treat other professionals required to obtain and maintain professional liability insurance, including physicians and podiatrists, in a different manner.

Rather, the same reasons that permit rescission of a legal malpractice insurance policy pertain to medical malpractice liability insurance. A policy will be issued following an analysis of the risk to be assumed. A misrepresentation of a

19

material fact in an application undermines the risk assessment and ultimately the decision to provide coverage by an insurer. Moreover, all forms of professional liability insurance serve the same purpose -- to defend when claims are filed against a professional and to serve as a source of funds to compensate injured patients or clients. Permitting reformation of a medical malpractice liability policy to conform to statutorily mandated minimum amounts also suggests that fraudulent conduct is condoned. Finally, reformation runs counter to our recent decision in Jarrell, which denied a direct action for compensation by an injured patient against an uninsured physician. Jarrell, supra, ___ N.J. at ___ (slip op. at 43).

B.

In reaching this determination, we also conclude that the compulsory automobile insurance model has no relevance to the remedial response to a fraudulently obtained policy of professional liability insurance and the effect of rescission on innocent third parties.

Recently, in CURE, supra, we explained that the long-established and comprehensive no-fault automobile insurance system, which is "designed to ensure that persons injured in motor vehicle accidents are compensated promptly for their injuries and financial losses," centers on compulsory automobile liability insurance. 223 N.J. at 152 (internal quotations

20

omitted). In order to preserve the benefits of that insurance, N.J.S.A. 39:6-48(a) provides that an automobile liability policy may not be "cancelled or annulled . . . after the insured has become responsible for the loss or damage" to an innocent third party. Thus, a fraudulently obtained policy of insurance is subject to rescission by the insurer, but an innocent third party injured by the insured before discovery of the fraud may look to the liability coverage in place at the time of injury up to the minimum mandatory insurance required by law. Palisades Safety & Ins. Ass'n v. Bastien, 175 N.J. 144, 148-49 (2003); Marotta v. N.J. Auto. Full Ins. Underwriting Ass'n, 280 N.J. Super. 525, 530 (App. Div. 1995), aff'd o.b., 144 N.J. 325 (1996).

Our no-fault automobile liability system provides further protection to insureds. For example, any person required to obtain automobile liability insurance acquires uninsured and underinsured motorist coverage. N.J.S.A. 17:28-1.1(b). Such coverage ameliorates the financial harm that may arise if a driver has no or insufficient coverage. In addition, an injured person may be able to obtain a financial recovery through the New Jersey Property-Liability Insurance Guaranty Association (PLIGA) for losses inflicted by financially irresponsible or

21

unknown owners or operators of motor vehicles.[5]  N.J.S.A. 39:6-61 to -91.  An injured, insured motorist may also obtain prompt medical treatment through the personal injury protection (PIP) benefits of an individual automobile liability insurance policy. N.J.S.A. 39:6A-4.  An injured person with no recourse to any insurance coverage may obtain damages for noneconomic loss, property damage, and PIP benefits through PLIGA.  N.J.S.A. 39:6-61 to -90.1.

The web of interrelated provisions attending the no-fault automobile liability model, including the compulsory automobile liability provisions, may minimize the number and amount of the claims of injured third parties.  Moreover, the compulsory automobile liability insurance model has created an expectation among those operating motor vehicles that every individual who may be in an accident will be insured.  By contrast, the Legislature has not constructed a similar matrix of alternate remedies for any other type of liability insurance, including compulsory professional liability insurance, or created an expectation that insurance coverage will be available to redress an injury even in the face of a fraudulently obtained policy.

---

[5] Prior to 2003, such recovery was obtained through the Unsatisfied Claim and Judgment Fund (UCJF).  See N.J.S.A. 39:6-64(c).  In 2003, the Legislature abolished the UCJF and transferred its claims to PLIGA, which was already administering other types of claims in this State.  L. 2003, c. 89, §§ 1, 2, 7.

22

Furthermore, the vast differences in the amount of liability insurance that a driver and a physician must carry counsels against utilizing the compulsory automobile liability insurance model to devise a remedy for an injured patient whose physician is uninsured by virtue of a rescission. The compulsory automobile liability insurance model also does not account for the fact that some physicians may have to procure professional liability insurance through a joint underwriting association due to market forces in the place where they practice. Such associations function essentially as mandatory assigned risk pools in order to permit physicians to obtain medical malpractice insurance and to provide essential medical services to patients. In order to maintain affordable rates, some associations have amassed operating losses. See Patricia M. Danzon, Medical Malpractice: Theory, Evidence, and Public Policy 93, 112 (1985). Indeed, unlike many other states' joint underwriting associations, the RIJUA remains in effect despite operating losses over the years. See Med. Malpractice Joint Underwriting Ass'n v. Paradis, 756 F. Supp. 669, 671 (D.R.I. 1991).

For those reasons, we conclude that the Appellate Division's reference to and reliance on the compulsory automobile liability insurance model was misplaced. Its reliance on that model also ignored this State's longstanding

23

rule that an insured professional cannot expect insurance coverage to respond to third-party claims when the professional liability insurance has been rescinded due to misrepresentations of material fact in the application.

V.

Finally, we address the purported conflict of laws identified by the Appellate Division. The panel declared a difference in the manner in which each state addressed compulsory medical malpractice insurance and determined that the difference constituted a conflict of laws. We conclude that such a determination was unfounded. As we have explained, resolution of the issue presented in this appeal begins and ends with the judicial response to a misrepresentation of material fact on an application for professional liability insurance. In this State, a court may rescind a policy ab initio, in which case the insured is without insurance coverage to respond to a claim by a third party. Based on our research, it appears that Rhode Island courts would do the same.

Our research has identified no case in Rhode Island that has addressed the issue presented in this appeal other than the judgment entered in the declaratory judgment action commenced by the RIJUA against Dr. Stoddard. There, due to his ineligibility for coverage through the RIJUA, the trial court rescinded the policy ab initio and declared that the RIJUA owed no obligation

24

to defend or indemnify Dr. Stoddard in the DeMarco action pending in New Jersey. This outcome is entirely consistent with well-established law in Rhode Island holding that an insurance policy is subject to rescission if the insurer was induced to insure an applicant based on a false representation of fact in the application. Evora v. Henry, 559 A.2d 1038, 1040 (R.I. 1989) (rescinding fire insurance policy); The Guardian Life Ins. Co. of Am. v. Tillinghast, 512 A.2d 855, 859 (R.I. 1986) (rescinding disability insurance policy). This rule applies broadly to a wide variety of insurance policies other than compulsory motor vehicle liability insurance. See, e.g., Commonwealth Land Title Ins. Co. v. IDC Props., Inc., 547 F.3d 15, 20-23 (1st Cir. 2008) (applying Rhode Island law to permit rescission of title insurance policy); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 38 (1st Cir. 2006) (applying Rhode Island law to permit rescission of marine insurance policy); see also R.I. Gen. Laws § 27-18-16 ("The falsity of any statement in the application for [accident and sickness insurance policies] may not bar the right to recovery under the policy unless the false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer." (emphasis added)).

Focusing as we have on the broader universe of insurance policies issued to protect an insured from a variety of risks, including professional liability claims, we discern that New

25

Jersey and Rhode Island permit rescission of an insurance policy when that policy has been issued based on misrepresentations of material fact. In each situation, other than the compulsory motor vehicle liability insurance model in each state, a third party who has asserted a claim or whose claim accrued prior to rescission receives no benefit from the rescinded policy. In short, although we cannot determine with certainty that the laws of each state are in harmony on this issue, we are also in no position to declare that a conflict exists between the laws of New Jersey and Rhode Island on this issue.

Finally, to the extent that each state requires a podiatrist to maintain medical malpractice liability insurance, we discern no difference in the laws of each state that amounts to a conflict of laws. To be sure, Rhode Island adopted a statute that established minimum levels of coverage lower than those required in New Jersey. Compare R.I. Gen. Laws § 42-14.1-2 (setting minimum amounts of $100,000 per claim and $300,000 per policy year), with N.J.S.A. 45:5-5.3 and N.J.S.A. 45:9-19.17 (requiring minimum amounts of $1 million per claim and $3 million per policy year). Furthermore, the executive agency tasked with adopting regulations to implement the Rhode Island statute did not do so until Fall 2013. See 02-030-021 R.I. Code R. § 5 (requiring minimum amounts of $1 million per claim and $3 million per policy year). Indeed, the mandatory nature of such

insurance remained an open question as late as 2013.  See Peloquin v. Haven Health Ctr. of Greenville, L.L.C., 61 A.3d 419, 429-30 (R.I. 2013).

A conflict of laws however does not arise unless there is a substantive difference between or among the potentially applicable laws.  Cornett v. Johnson & Johnson, 211 N.J. 362, 374 (2012); P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008).  A substantive difference between the law of one state and another exists when the difference is offensive or repugnant to the public policy of this State.  Cornett, supra, 211 N.J. at 377.  Here, the difference cannot be considered substantive.  Both states have declared that physicians and podiatrists are required to obtain and maintain medical malpractice liability insurance.  Moreover, Dr. Stoddard had a policy of medical malpractice liability insurance in place at all relevant times, rendering any differences in the states' insurance coverage requirements irrelevant.  Rather, the issue presented in this case is whether an insurance policy is subject to rescission based on a false representation of fact in the insurance application.  With respect to that core issue, both states agree that rescission is the appropriate remedy.

VI.

In summary, it is well established in this State that a professional who has made a misrepresentation of material fact

27

in an application for professional liability insurance can expect that the policy may be rescinded on application of the insurer.  A professional in that position can also expect that claims that arose prior to discovery of the misrepresentation will be excluded from coverage.  In other words, once the policy has been rescinded, the professional responds to any claims from injured third parties without coverage.

Here, the policy of professional liability issued to Dr. Stoddard was rescinded due to misrepresentations concerning the extent of his practice in Rhode Island.  Those misrepresentations went to his eligibility of insurance through the RIJUA.  As a result of the RIJUA's rescission of the policy, Dr. Stoddard stood without coverage to respond to the DeMarcos' claim.  We have not identified any sound reason to treat medical professionals any differently than other similarly situated professionals.  We cannot identify a sound reason to permit reformation of a rescinded professional liability policy to the statutory minimum of $1 million.[6]

We therefore hold that the Appellate Division erred when it resorted to the compulsory automobile liability insurance model

---

[6] We also reject the suggestion that whether the RIJUA actually and reasonably relied on Dr. Stoddard's misrepresentation of the location of his practice is an unresolved issue of fact.  Dr. Stoddard had notice of and every opportunity to contest the declarative judgment action.  He chose not to do so and a final judgment has been entered granting full relief to the RIJUA.

28

rather than the existing rule governing professional liability insurance to fashion a remedy for injured third parties affected by rescission of the medical care provider's insurance. Having obtained a judgment rescinding the medical malpractice liability policy, the RIJUA owed no duty to defend Dr. Stoddard or to indemnify him in the medical malpractice action pending against Dr. Stoddard in this State.

VII.

The judgment of the Appellate Division is reversed.

JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUDGE CUFF's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.

THOMAS DEMARCO and CYNTHIA
DEMARCO,

    Plaintiffs-Respondents,

        v.

SEAN ROBERT STODDARD, D.P.M.,
Individually and t/a CENTER
FOR ADVANCED FOOT & ANKLE
CARE, INC.,

    Defendant,

       and

MEDICAL MALPRACTICE JOINT
UNDERWRITING ASSOCIATION OF
RHODE ISLAND,

    Defendant-Appellant.


    JUSTICE ALBIN, dissenting.

    All physicians and podiatrists who practice medicine in New Jersey are required to maintain at least $1,000,000 in medical malpractice insurance or a $500,000 letter of credit.  N.J.S.A. 45:9-19.17(a); N.J.S.A. 45:5-5.3; N.J.A.C. 13:35-6.18.  The purpose of this compulsory insurance law is to ensure that patients can secure financial compensation in the event of a doctor's professional negligence.  Every patient has a right to presume that his physician is in compliance with the law.

    In this case, defendant Dr. Sean Stoddard, a podiatrist,

1

misrepresented to his medical malpractice insurer -- the Medical Malpractice Joint Underwriting Association of Rhode Island (RIJUA) -- that the majority of his podiatry practice was in Rhode Island, rather than New Jersey. During the period the RIJUA insured him, Dr. Stoddard performed foot surgery on plaintiff Thomas DeMarco (DeMarco). In a medical-malpractice action, DeMarco sought damages from Dr. Stoddard for worsening his medical condition. In addition, DeMarco's wife filed a loss-of-consortium claim. After the DeMarcos filed their lawsuit, the RIJUA cancelled Dr. Stoddard's malpractice insurance. The RIJUA claims that its insurance contract with Dr. Stoddard should not only be rescinded, but also that the rescission should be backdated, thus denying the DeMarcos the protection of the insurance coverage that was in effect at the time of the allegedly botched surgery.

I agree with the majority's conclusion that New Jersey law applies to the DeMarcos' lawsuit. I disagree that under this State's law, the medical-malpractice carrier in this case can retroactively cancel malpractice insurance to deny an innocent patient coverage for a physician's professional negligence. The approach taken by the majority is at complete odds with our State's public policy, which finds expression in our compulsory medical malpractice insurance law. The aim of the law is to provide financial protection to every patient in this State.

2

The RIJUA was in the best position to ferret out any misrepresentation made by Dr. Stoddard when he applied and reapplied for malpractice insurance coverage. The innocent patient was in no position to do so.

I would require the insurer to provide coverage up to $500,000 to DeMarco and his wife. After all, DeMarco underwent surgery with Dr. Stoddard when he was lawfully insured -- that is, before the carrier backdated the rescission. At the time of DeMarco's surgery, the RIJUA, in effect, represented to the world that it was insuring Dr. Stoddard against claims of negligence. The public had the right to rely on that representation. By requiring coverage, the equities of all parties are balanced, and the patient receives the benefit of the financial security intended by the law.

Because the majority has taken the path that leaves the innocent patient without compensation for his injuries and rewards the insurance company for its lack of due diligence, I respectfully dissent.

I.

In this case, Dr. Stoddard purchased medical malpractice insurance from the RIJUA. In his application, he misrepresented the primary location of his practice. From 2007 until 2011, Dr. Stoddard represented to the RIJUA that at least fifty-one percent of his podiatry practice was generated in Rhode Island -

3

- a prerequisite to receiving the RIJUA's insurance coverage. Dr. Stoddard's Rhode Island practice, however, never met the RIJUA's fifty-one percent requirement.

In each of his insurance applications from 2007 through 2010, Dr. Stoddard indicated that his office was located in Rhode Island, although he did list his telephone and fax numbers as having a 732 New Jersey area code, which should have signaled that he had a New Jersey office. In Dr. Stoddard's renewal application for March 2010 to March 2011, he gave 1195 Highway 70, #12, Lakewood, New Jersey as the address for his office. Once again, he provided a New Jersey telephone number. The RIJUA was on notice that Dr. Stoddard had a New Jersey practice when he performed surgery on DeMarco in September 2010.

Only after October 2011, when the DeMarcos filed a medical malpractice lawsuit alleging that Dr. Stoddard negligently performed surgery, did the RIJUA rescind its insurance policy on the basis that the majority of Dr. Stoddard's podiatry practice was not situated in Rhode Island, as represented in his malpractice-insurance applications. The RIJUA returned Dr. Stoddard's premium payments for the period from March 2010 to January 2011, but kept the premiums paid from 2007 through February 2010. Dr. Stoddard informed DeMarco that he had no assets. DeMarco and his wife then amended their complaint seeking the payment of damages from the RIJUA on the malpractice

4

claim.

Both the trial court and the Appellate Division in a well-reasoned opinion, DeMarco v. Stoddard, 434 N.J. Super. 352 (App. Div. 2014), held that the RIJUA was required to provide coverage of $1,000,000 should Dr. Stoddard be found liable on the malpractice claim.

## II.

### A.

All physicians and podiatrists who practice medicine in New Jersey are required to maintain medical malpractice liability insurance. N.J.S.A. 45:9-19.17(a); N.J.S.A. 45:5-5.3. According to N.J.S.A. 45:9-19.17(a),

> [a] physician who maintains a professional medical practice in this State and has responsibility for patient care is required to be covered by medical malpractice liability insurance issued by a carrier authorized to write medical malpractice liability insurance policies in this State, in the sum of $1,000,000 per occurrence and $3,000,000 per policy year and unless renewal coverage includes the premium retroactive date, the policy shall provide for extended reporting endorsement coverage for claims made policies, also known as "tail coverage," or, if such liability coverage is not available, by a letter of credit for at least $500,000.

The requirement that physicians and podiatrists maintain $1,000,000 in coverage per occurrence or $500,000 by a letter of credit is "to ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a

physician or podiatrist is found responsible for acts of malpractice." Assembly Health Comm., Statement to S. 267 (Sept. 19, 1996). The clear intent of the legislation is to provide financial protection to patients who suffer preventable injuries at the hands of their doctors.

The question in this case is whether a medical-malpractice insurer may avoid paying damages to an innocent patient when the rescission of the physician's insurance policy is backdated, thus denying the patient the benefit of the coverage in effect at the time the malpractice occurred.

### B.

"[A] material factual misrepresentation made in an application for insurance may justify rescission if the insurer relied upon it to determine whether or not to issue the policy." Remsden v. Dependable Ins. Co., 71 N.J. 587, 589 (1976); see also Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 527-28 (2008); Mass. Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 111 (1991); N.Y. Life Ins. Co. v. Weiss, 133 N.J. Eq. 375, 379-80 (1943). Rescission of the contract prevents an insured from directly benefiting from his misrepresentation. Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 612 (1989).

But different interests are in play when a scheme of compulsory insurance is intended to protect innocent members of the public, such as in our compulsory insurance laws for

6

automobiles, limited liability partnerships, and the practice of medicine. In such cases, our jurisprudence draws a distinction between the party who procures an insurance policy through misrepresentations and the innocent party who plays no role in a fraud on the insurer and is a victim falling within the coverage protections of the insurance policy. LaCroix, supra, 194 N.J. at 530-32; see also Fisher v. N.J. Auto. Full Ins. Underwriting Ass'n, 224 N.J. Super. 552, 557 (App. Div. 1988) ("The insurance carrier's liability to its [in]sured who may be guilty of some act or conduct which renders a policy void ab initio is therefore distinct from its liability to an injured third person."). Thus, "an insurer cannot, on the ground of fraud or misrepresentations relating to the inception of the policy, retrospectively avoid coverage under a compulsory or financial responsibility insurance law so as to escape liability to a third party." Fisher, supra, 224 N.J. Super. at 558 (quoting 7 Am. Jur. 2d Automobile Insurance § 37 (1980)); see also Palisades Safety & Ins. Ass'n v. Bastien, 175 N.J. 144, 149 (2003) (noting that insurance company cannot "escape[] liability in respect of innocent, third-party members of the public whose protection is a paramount concern"). An example of those equitable principles is found in our automobile insurance law.

In New Jersey, all motor vehicle owners must maintain liability insurance coverage. N.J.S.A. 39:6B-1(a). Moreover,

7

"once its insured has become responsible for damages to third-party judgment creditors, an insurer is precluded from retroactively 'cancelling' or 'annulling' an automobile liability policy based upon prior misrepresentations or fraud of its insured."  N.J. Mfrs. Ins. Co. v. Varjabedian, 391 N.J. Super. 253, 256 (App. Div.) (quoting N.J.S.A. 39:6-48(a)), certif. denied, 192 N.J. 295 (2007).  The principle that an insurance company cannot void a policy to the detriment of an innocent third party has been upheld in cases involving compulsory insurance laws intended for the protection of the public.

In LaCroix, supra, we determined that the insured's eighteen-year-old daughter could not be barred from receiving "personal-injury-protection (PIP) benefits under her father's automobile insurance policy because, unbeknownst to her, her father had not identified her as a household resident in his insurance application."  194 N.J. at 518-19.  The father was required to purchase PIP coverage under N.J.S.A. 39:6A-4.3. Lacroix, supra, 194 N.J. at 532.  We held that "the equitable remedy of rescission properly was molded to require payment of the statutorily required minimum level of PIP benefits to" the daughter who suffered injuries in an automobile accident.  Id. at 519.  We did so because the daughter was "innocent of the deceit perpetrated by her father" and because "we have never

8

turned a deaf ear to the equities when plainly innocent parties cry out for relief." Id. at 530-31.

C.

No controlling precedent supports the position the majority takes today, reversing both the trial court and the Appellate Division and leaving the innocent patient remediless. The majority reaches the inequitable, not the inevitable, outcome.

First, the comparison of physicians and podiatrists to lawyers in general is not apt because lawyers are not presently subject to a comprehensive legislative or judicial scheme mandating the purchase of malpractice insurance. Lawyers are required to purchase malpractice insurance only if they organize as professional corporations or limited liability partnerships. R. 1:21-1A(a)(3), -1B(a)(4), -1C(a)(3).

Second, none of the legal-malpractice cases cited by the majority bear any resemblance to the facts before us. Liberty Surplus Insurance Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 439-41 (2007), merely stands for the proposition that a law firm forfeited coverage in a malpractice case under a claims-made policy by misrepresenting in the insurance application that it was unaware of a potential claim at the time the application was completed. Liberty Surplus deals with the denial of a claim, not the rescission of an insurance policy. Ibid.

In Liebling v. Garden State Indemnity, 337 N.J. Super. 447,

9

450-51 (App. Div.), certif. denied 169 N.J. 606 (2001), an attorney did not disclose in an application for a claims-made malpractice insurance policy that a potential malpractice lawsuit was looming. The attorney knew that he would likely be sued for failing to file a civil action within the statute of limitations. Id. at 464-65. The Appellate Division concluded that the attorney "could not have honestly believed that he was secure from a claim, and, therefore, [the insurance carrier] was justified in denying coverage." Liberty Surplus, supra, 189 N.J. at 449 (citing Liebling, supra, 337 N.J. Super. at 464-65).

Last, First American Title Insurance Co. v. Lawson, 177 N.J. 125 (2003), engaged in a finely nuanced balancing of equities in reviewing whether an insurance carrier was required to provide coverage to three attorneys of a law firm organized as a limited liability partnership. Two of the attorneys, one of whom was unauthorized to practice law in New Jersey, were engaged in a "'kiting' scheme whereby monies from one client trust account would be transferred to pay the obligations of another client." Id. at 130 (quoting First Am. Title Ins. Co. v. Lawson, 351 N.J. Super. 407, 414 (App. Div. 2002)). This Court affirmed the forfeiture of coverage for those two malefactors, one of whom applied for the firm's claims-made professional liability insurance policy with full knowledge of their wrongdoing, id. at 129 -- wrongdoing that violated the

10

Rules of Professional Conduct.[1]

However, the Court took a different approach with respect to the innocent law partner. We held that the innocent attorney could not be stripped of insurance coverage because, unbeknownst to him, the managing partner and another partner committed fraudulent acts and secured malpractice insurance through misrepresentations. Id. at 129-31. We noted that our Rule of Court requiring a limited liability partnership to maintain professional liability insurance, R. 1:21-1C(a)(3), "helps to limit the public's exposure to uninsured risks arising from the receipt of legal services in this State." Lawson, supra, 177 N.J. at 139. We explained that the innocent partner "had every reason to expect that his exposure to liability would be circumscribed in accordance with the Uniform Partnership Law," which "shield[s] partners from incurring liability arising solely from the wrongful acts of fellow partners." Id. at 136, 142. Additionally, we noted that denying coverage to the innocent law partner "could leave members of the public, whom [the innocent partner] had represented throughout that period, unprotected even though the insured himself committed no fraud." Id. at 143.

---

[1] Victims of such illegal schemes are financially protected up to an amount fixed by the New Jersey Lawyers' Fund for Client Protection. R. 1:28.

11

Thus, in Lawson, this Court protected the innocent attorney from a backdated rescission of an insurance policy because he was unaware of his partner's misrepresentations in securing the insurance coverage. Lawson is a study in how to balance equities. It is not a mandate to deny insurance coverage to the innocent patient who suffered medical malpractice in this case.

III.

Here, in viewing the totality of the circumstances, equity weighs in favor of upholding the RIJUA's obligation to cover the claim of DeMarco and his wife. The omitted information in Dr. Stoddard's application and reapplication pertained only to the geography of his practice, not to his ability to perform his professional duties. The issue is not whether the RIJUA has a right to rescind Dr. Stoddard's insurance, but whether it has the right to backdate the rescission at the expense of the innocent patient.

In balancing the equities, we should place great emphasis on the fact that the RIJUA was in the best position to uncover any inaccuracies in Dr. Stoddard's insurance applications. By September 2010, when the alleged malpractice occurred, Dr. Stoddard's practice in New Jersey was open and notorious. In his insurance renewal application filed earlier that year, Dr. Stoddard listed an address in Lakewood, New Jersey as the location of his podiatry practice.

12

Had the RIJUA exercised even a minimal degree of due diligence, it would have discovered that Dr. Stoddard's practice was not primarily located in Rhode Island.  Only when the RIJUA had to pay out on a potential claim -- not when it was accepting premiums -- did it make a reasonable inquiry.  Other jurisdictions, as a matter of sound public policy, require an insurance company to exercise due care in reviewing an insurance application at the time it is submitted.  See, e.g., Olivio v. Gov't Emps. Ins. Co. of Washington D.C., 362 N.Y.S.2d 873, 880 (App. Div. 1975) (requiring insurer to pay third-party victim full policy amount -- as opposed to minimum compulsory amount -- when insurer negligently delayed investigation of fraudulent application until after suit was filed); State Farm Mut. Auto. Ins. Co. v. Wood, 483 P.2d 892, 893 (Utah 1971) ("An insurer cannot neglect its duty to make a reasonable investigation of insurability or postpone that investigation until after it learns of a probable claim and still retain its [premiums.]").  Dr. Stoddard's renewal application contained the location and telephone number of his New Jersey practice.  That was a sufficient red flag to prompt an inquiry by the RIJUA if it did not want to continue collecting Dr. Stoddard's premiums.

Like the innocent parties in LaCroix and Lawson, DeMarco was entirely unaware of any misrepresentation made by Dr. Stoddard to the RIJUA and had no ability to discover it.

13

Instead, the patient had the reasonable expectation that his podiatrist was in compliance with the statutory requirement to maintain medical malpractice insurance. He also had the right to rely on the fact that, at the time of his surgery, the RIJUA was Dr. Stoddard's malpractice carrier.

To require the DeMarcos to bear the entire cost of damages resulting from Dr. Stoddard's alleged malpractice is inconsistent with principles of equity. The RIJUA in this case has reaped a windfall -- it pocketed three years of premiums, backdated a rescission, and is not required to expend a single dollar of collected premiums to compensate the innocent patient and his wife victimized by Dr. Stoddard's alleged medical malpractice. That is hardly an equitable result, nor is it in keeping with New Jersey's public policy.

That public policy is clearly expressed in our law that mandates insurance coverage for innocent victims of medical malpractice, in circumstances such as we have here. The RIJUA should be required to pay up to the minimum amount of insurance that a patient expects a doctor to maintain -- the $500,000 necessary for a letter of credit.

In reversing the trial court and Appellate Division, the majority has decided on an approach that leaves an innocent patient without a source of compensation for damages suffered by the malpractice of his insolvent doctor.

14

Because that approach is contrary to public policy, I respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO.     A-104          SEPTEMBER TERM 2013

ON APPEAL FROM        Appellate Division, Superior Court


THOMAS DEMARCO and CYNTHIA
DEMARCO,

        Plaintiffs-Respondents,

                v.

SEAN ROBERT STODDARD, D.P.M.,
Individually and t/a CENTER FOR ADVANCED
FOOT & ANKLE CARE, INC.,

        Defendant,

                and

MEDICAL MALPRACTICE JOINT
UNDERWRITING ASSOCIATION OF RHODE
ISLAND,

        Defendant-Appellant.



DECIDED                December 1, 2015
                    Chief Justice Rabner                    PRESIDING
OPINION BY       Judge Cuff (temporarily assigned)
CONCURRING/DISSENTING OPINION BY
DISSENTING OPINION BY       Justice Albin

| CHECKLIST | REVERSE | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER |  | X |
| JUSTICE LaVECCHIA | X |  |
| JUSTICE ALBIN |  | X |
| JUSTICE PATTERSON | X |  |
| JUSTICE FERNANDEZ-VINA | X |  |
| JUSTICE SOLOMON | X |  |
| JUDGE CUFF (t/a) | X |  |
| TOTALS | 5 | 2 |